N.R. SMITH, Circuit Judge, delivered the opinion of the Court, which is joined in full by Judges IKUTA and WATFORD. Chief Judge KOZINSKI, Judge BYBEE, and Judge CALLAHAN join Parts I and II. Judges PREGERSON, WARDLAW, BERZON, MURGUIA, and CHRISTEN join Part III.
OPINION
N.R. SMITH, Circuit Judge:
Arizona state prisoner Gregory Scott Dickens appeals the district court’s denial *1306 of his 28 U.S.C. § 2254 habeas corpus petition. We affirm the district court’s conclusion that (1) the Arizona Supreme Court did not unreasonably apply Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3868, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), to the facts of this case and (2) the Arizona Supreme Court did not base its decision on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). However, we reverse the district court’s denial of one of Dickens’s ineffective assistance of counsel claims.[1] While we agree that Dickens defaulted on this claim by failing to fairly present the claim to the Arizona courts, we remand to allow the district court to reassess whether Dickens can establish cause and prejudice to excuse the procedural default under Martinez v. Ryan,—U.S.-, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).
FACTS[2]
In January 1990, Dickens became acquainted with then fourteen-year-old Travis Amaral. Dickens met Amaral while working as a counselor at Oak Grove Institute in Temecula, California. Oak Grove is a placement center for violent juveniles where Amaral lived at the time. While working with Amaral, Dickens learned that he was a “high risk” patient with a “violent and explosive temper.” Dickens also discovered that Amaral battered a nurse and frequently bragged about carrying guns and being involved in several murders. In March 1990, Dickens quit working at Oak Grove, but continued his friendship with Amaral.
In early September 1991, Dickens moved to Yuma, Arizona. A few days after his move, Amaral contacted Dickens and explained that he was running away from home. Dickens purchased a bus ticket for Amaral to travel to Yuma. Amaral arrived in Yuma on September 8, 1991. The two then spent the next several days recreating near the Colorado River. Dickens showed Amaral a .38-caliber revolver he had recently acquired and, at some point during their time together, Amaral attempted to intimidate Dickens by pointing the revolver at Dickens’s head.
Dickens paid for Amaral’s food and transportation during his visit to Yuma. But Dickens was running low on cash. On September 10, 1991, Dickens and Amaral discussed “ways to get more money,” while eating dinner at a Hardee’s restaurant. Dickens suggested they plan a robbery. They flipped a coin to decide who would conduct the first robbery. Amaral won. Dickens then gave Amaral a choice of several locations to commit the robbery. His options included a convenience store and a highway rest stop. Amaral selected the rest stop since it was “out of the way,” less busy, and “easier.”
Dickens and Amaral left the restaurant and drove to a rest area on the eastbound side of Interstate 8, east of Yuma. Dickens removed his .38-caliber revolver from the glove compartment and placed it on a seat in the vehicle. At some point while waiting at the rest stop, Amaral again pointed the revolver at Dickens’s head to intimidate him. After waiting at the rest area for approximately three hours, Dickens *1307 and Amaral saw Bryan and Laura Bernstein enter the rest area for westbound traffic on the opposite side of the freeway.[3] Dickens nodded his head and either handed Amaral the handgun or watched him remove it from the seat. They agreed that, once Amaral robbed the Bernsteins, he would run down the westbound ramp of the rest area where Dickens would pick him up.
Dickens watched from his truck on the opposite side of the highway as Amaral crossed the interstate, approached the Bernsteins, and asked if they had the time.[4] Laura responded, “9:17 [p.m.].” Amaral then pointed the gun at Bryan and demanded his wallet. Once Bryan surrendered his wallet, Amaral asked Laura for her wallet, but she did not have one. Amaral then ordered the Bernsteins to walk past their car and turn around. From the opposite side of the highway, Dickens observed Amaral moving the Bernsteins across the beams of light from their headlamps. Amaral asked if they were ready to die and then shot Laura in the head. Dickens saw the bright flash of the gun as Amaral shot Laura. Laura fell to the ground and Bryan crouched down over her. Amaral then recocked the revolver, pointed it at Bryan, and shot him in the head.
After observing the robbery and shootings, Dickens drove across the median and through the rest area. No evidence suggests Dickens stopped to aid the Bern-steins, called for emergency medical assistance, or otherwise notified the authorities. Dickens then picked up Amaral on the westbound side of the highway and asked, *1308 “Do you have the wallet?” Amaral replied that he did and handed the wallet to Dickens. Dickens searched the wallet and returned it to Amaral. Dickens explained to Amaral that he had driven through the rest area to make sure “everything was taken care of.” They then drove to the home of Dickens’s brother where Amaral removed cash, traveler’s checks, and one credit card from Bryan’s wallet. Dickens and Amaral burned the wallet and its remaining contents. They split the cash, Amaral pocketed the credit card and they later destroyed the traveler’s checks.
At approximately 9:40 p.m., a deputy sheriff drove into the rest area and found the Bernsteins lying on the ground in front of their vehicle. Laura was dead. Bryan was semiconscious, thrashing around, and moaning in pain. Bryan told the deputy that he had been threatened with a gun, attacked, and thought he had been shot. Bryan died shortly thereafter.
On September 11, the morning following the murders, Amaral unsuccessfully attempted to use Bryan’s credit card at a local K-Mart. Dickens and Amaral spent that night at a Motel 6 where Dickens had rented a room. Early the next morning, Dickens drove to Carlsbad, California, and Amaral went back to his mother’s house.
Dickens and Amaral met up again in March 1992, and Amaral stayed with Dickens for one or two weeks in a San Diego, California apartment. Amaral’s mother reported Amaral as a runaway and gave Dickens’s address to the police. The police conducted an investigation into sex abuse charges against Dickens. San Diego police officers eventually arrested Dickens on charges of sexually abusing Amaral (and other boys) and assault with a deadly weapon.[5] During an interview concerning the alleged abuse, Amaral told officers that he and Dickens had been involved in the double homicide in Yuma.
PROCEDURAL HISTORY
In April 1992, Dickens was indicted for two counts of premeditated first-degree murder, two counts of felony first-degree murder, one count of conspiracy to commit first-degree murder, one count of conspiracy to commit armed robbery, and two counts of armed robbery. After a trial, he was acquitted of premeditated murder and conspiracy to commit murder. However, he was convicted of the felony murders and armed robberies of Bryan and Laura Bernstein and conspiracy to commit armed robbery. The sentencing court found no mitigating factors and thus sentenced Dickens to death on the felony murder counts.[6] The sentencing judge ordered that, if the sentences were ever reduced, then they should be served consecutively. The court also sentenced Dickens to fourteen years’ imprisonment on the conspiracy and armed robbery convictions, to be served consecutively to the death sentences.
Dickens applied for post-conviction relief from the trial court but was denied. Dickens then appealed his conviction and sentence to the Arizona Supreme Court. That court affirmed the trial court’s denial, noting that “[t]his is not a case of lingering *1309 doubt” and that overwhelming evidence supported the conviction and capital sentences. State v. Dickens, 187 Ariz. 1, 926 P.2d 468, 493 (1996) (in banc).
Dickens subsequently filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with the U.S. District Court for the District of Arizona. In the federal habeas proceeding, Dickens changed his ineffective assistance of counsel (“IAC”) claim to include extensive factual allegations that he suffered from Fetal Alcohol Syndrome (“FAS”) and organic brain damage. The district court concluded that Dickens’s new claim was procedurally barred and, with regard to his other arguments, denied his petition. Dickens appealed the district court’s decision to this court.
A divided panel of our court affirmed the district court’s denial of Dickens’s En-mund/Tison claim. However, all three judges agreed that the district court’s conclusion that Dickens procedurally defaulted his IAC claim should be vacated and remanded to allow the district court to reassess the claim in light of the Supreme Court’s decision in Martinez v. Ryan,—U.S.-, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012). Both parties petitioned for this Court to rehear the case en banc, and a majority of non-recused active judges voted to rehear the case.
STANDARD OF REVIEW
We review de novo the district court’s order denying the petition. Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir.2008).
The Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”) applies to this court’s review of Dickens’s claims. See Lindh v. Murphy, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The threshold a defendant must overcome to obtain relief under AEDPA is high. Specifically, to obtain relief under AEDPA Dickens must show that the Arizona Supreme Court’s decision was either (1) “contrary to” clearly established federal law as determined by the Supreme Court, (2) “involved an unreasonable application of such law,” or (3) “was based on an unreasonable determination of the facts in light of the record before the state court.” Harrington v. Richter,—U.S.-, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (quoting 28 U.S.C. § 2254) (internal quotation marks omitted).
Because the relevant state court determination for a habeas petition is the last reasoned state court decision, we review the Arizona Supreme Court’s decision denying Dickens relief. See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.2008) (citing Ylst v. Nunnemaker, 501 U.S. 797, 804-06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)). “State-court decisions are measured against [the Supreme Court’s] precedents as of ‘the time the state court renders its decision.’ ” Cullen v. Pinholster,—U.S.-, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011) (quoting Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)). “[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.” Lockyer, 538 U.S. at 75-76, 123 S.Ct. 1166 (internal quotation marks and citation omitted). “Rather, that application must be objectively unreasonable.” Id. at 76, 123 S.Ct. 1166 (emphasis added).
DISCUSSION
Dickens argues that the Arizona Supreme Court unreasonably applied En-mund%/Tison when it upheld Dickens’s *1310 death sentence.[7] Dickens also argues that the Arizona Supreme Court based its decision on an unreasonable determination of the facts. Finally, Dickens claims that his counsel was ineffective at sentencing, because counsel failed to adequately investigate and present certain mitigating evidence.
We reject Dickens’s first two arguments and affirm the district court’s denial of Dickens’s Enmund/Tison claim. However, we reverse the district court’s conclusion that Dickens failed to show cause to overcome his procedural default and remand so that the district court can determine whether Dickens can show cause and prejudice under Martinez.
I. The Arizona Supreme Court did not unreasonably apply En-mund/Tison.
The Arizona Supreme Court correctly identified Enmund and Tison as the clearly established federal law governing Dickens’s claim. In Enmund, the Supreme Court reversed the death sentence of a defendant convicted under Florida’s felony-murder rule. 458 U.S. at 798, 102 S.Ct. 3368. In Tison, the Supreme Court affirmed the death sentences of two defendants convicted under Arizona’s felony-murder rule. 481 U.S. 137, 107 S.Ct. 1676.[8] In distinguishing between the two cases, the Tison Court articulated a two prong standard to determine whether a felony murder defendant is death eligible. For a death sentence to be constitutional under the Eighth Amendment, the state must show the defendant’s “[1] major participation in the felony committed, [2] combined with reckless indifference to human life.” 481 U.S. at 158,107 S.Ct. 1676. For the reasons stated below, the Arizona Supreme Court did not unreasonably conclude that Dickens was a major participant in the Bernsteins’ robbery/murder and acted with reckless indifference to human life.
A. Major participation
Dickens claims that his participation in the crimes was insufficient to warrant a death sentence, like the defendant in En-mund. Enmund was the driver of the getaway car in an armed robbery in which his accomplices murdered an elderly couple who resisted the robbery. 458 U.S. at 784-86, 102 S.Ct. 3368. The Court determined that Enmund “did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.” Id. at 795, 102 S.Ct. 3368. The Court noted that “the only evidence of the degree of [Enmund’s] participation [was] the jury’s likely inference that he was the person in the car by the side of the road near the scene of the crimes[,] ... waiting to help the robbers escape.... ” Id. at 786, 102 S.Ct. 3368 *1311 (internal quotation marks omitted). There was no evidence that Enmund provided the murder weapons, knew of the shooters’ violent propensities, planned the underlying crime, or continued to assist the perpetrators after they murdered their victims. Enmund’s only participation was that of getaway driver. Id. at 786 n. 2, 102 S.Ct. 3368.
By contrast in Tison, the defendants helped their father and his cellmate — both convicted murderers — escape from prison, armed them with shotguns, helped flag down and kidnap a family on an isolated road, drove the family to a remote site, and then stood by as their father and his cellmate murdered the four family members. 481 U.S. at 139-41, 107 S.Ct. 1676. The Court concluded that the Tison brothers’ major participation in the crimes distinguished them from Enmund. Id. at 151-52, 107 S.Ct. 1676. The Court noted that the Tison defendants: (1) “actively participated in the events leading to the death by, inter alia, providing the murder weapons and helping abduct the victims”; (2) were “present at the murder site, [and] did nothing to interfere with the murders”; (3) “ma[de] no effort to assist the victims before, during, or after the shooting”; (4) “after the murders ... continued on the joint venture”; and (5) “could anticipate the use of lethal force” during the commission of their crimes. Id. at 145, 151, 107 S.Ct. 1676 (internal quotation marks omitted).
In this case, the Arizona court’s application of federal law was not objectively unreasonable. Indeed, Dickens participated in the crimes to nearly the same extent as the Tison defendants. As in Tison, Dickens participated in the events leading up to the death, because he “suggested they plan a robbery,” “[t]he robberies were premeditated, planned, and agreed on by [Dickens] and Amaral,” and “[Dickens] drove Amaral to the scene.” Dickens, 926 P.2d at 474, 490. Dickens was present at the murder site and did not interfere with the murders since Dickens “wait[ed] and watch[ed] for approximately three hours” for the victims to arrive and then “[Dickens] waited while Amaral committed the robberies.” Id. at 474, 490. Dickens made no effort to assist the victims but rather “picked up Amaral” after the crime “then drove to the home of [his] brother.” Id. at 475. Dickens continued the joint venture when he “witnessed the destruction of evidence, and failed to report the crimes.” Id. at 490. And finally, Dickens could have anticipated that Amaral would use lethal force since “[Dickens] furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies.” Id. In short, Dickens was actively involved in every aspect of the deadly crime — suggesting they undertake the robbery, planning the robbery, staking out the crime scene, selecting the victims, arming Amaral with a handgun,[9] watching the murders, aiding Amaral’s escape, destroying evidence, and helping Amaral evade capture. Dickens was clearly a major participant in the crime.
Nonetheless, Dickens insists his conduct was more akin to the defendant in En-mund than to the defendants in Tison. *1312 While we disagree for the reasons stated above, more importantly, Dickens’s argument overlooks the deference we owe the Arizona Supreme Court’s decision under AEDPA. At the very least, reasonable minds could differ as to whether Dickens’s participation level is closer to the defendant in Enmund than the defendants in Tison. See Richter, 131 S.Ct. at 786. Ti-son does not illuminate the precise line where a defendant’s conduct becomes “major participation.” Thus, even assuming that Dickens’s conduct falls into a “grey area” between Enmund and Tison, we must defer to the Arizona Supreme Court’s conclusion. See Wright v. Van Patten, 552 U.S. 120, 126, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) (per curiam) (“Because [Supreme Court precedent] give[s] no clear answer to the question presented ... it cannot be said that the state court unreasonably applied clearly established Federal law.” (internal quotation marks and alterations omitted)).
One of Dickens’s arguments in particular illustrates AEDPA’s effect on his claim. Dickens argues that Enmund and Tison require a defendant’s immediate physical presence at the murder scene to qualify for the death penalty. Dickens bases this argument on an arguable distinction between this case and Tison: the Tison brothers were apparently in closer proximity to the killings than Dickens. See 481 U.S. at 141, 144-45, 107 S.Ct. 1676. However, nowhere in Enmund or Tison does the Supreme Court clearly establish that “presence” at a murder scene is a mandatory prerequisite for the death penalty. Instead, physical presence is merely one of several factors relevant to the “major participation” prong of the Tison analysis. Id. at 158, 107 S.Ct. 1676. The Tison court never stated that one factor was more important than another factor. Rather, it simply concluded that the defendants’ actions collectively demonstrate a “high level of participation ... [that] implicates them in the resulting deaths.” Id.
Here, the Arizona Supreme Court considered Dickens’s “presence” at the murder scene along with the other relevant factors. See Dickens, 926 P.2d at 490. Its failure to give the presence factor any particular weight relative to any other factor demonstrating Dickens’s “high level of participation” in the crimes did not violate clearly established federal law. Thus, we cannot say that the Arizona Supreme Court’s decision was objectively unreasonable, regardless of whether Tison is distinguishable from Dickens’s case on the “presence” factor.
Furthermore, even if “presence” were the dispositive factor in the “major participant” analysis, Dickens would face an additional AEDPA hurdle. The Supreme Court has never defined “presence” as it pertains to major participation in a capital crime. As a result, the Arizona Supreme Court had only the two contrasting examples of presence in Enmund and Tison to guide its reasoning. In Enmund, where the defendant sat in a car outside the home where two victims were shot to death and neither heard nor observed the murders, the Court concluded that the defendant “was not present when the killing took place.” 458 U.S. at 795, 102 S.Ct. 3368. However, in Tison, where the defendants stood by as four people were gunned down, the Court determined the defendants were “present” at the murder site. 481 U.S. at 145, 107 S.Ct. 1676.[10] *1313 The lack of any Supreme Court precedent defining “presence” requires us to give the Arizona Supreme Court some “leeway” in making its determination. See Richter, 131 S.Ct. at 786.
Here, the Arizona Supreme Court suggested that Dickens’s presence at the murder scene — combined with his other actions leading up to and following the crimes — qualified him as a major participant. See Dickens, 926 P.2d at 490. The record demonstrates that this was not an unreasonable conclusion. Dickens testified at trial that he watched, as the Tison brothers presumably did, each part of the Bernsteins’ murders as they unfolded. Dickens saw the Bernsteins pull into the rest stop. After selecting the Bernsteins as the victims, Dickens nodded his head and watched Amaral walk across the highway with a loaded .38-caliber handgun, knowing Amaral was going to rob the Bernsteins at gunpoint. He was close enough to see Amaral moving the Bern-steins around the front of their car in the path of the illuminated headlamps and to see flashes as Amaral shot the victims in the head. Then, rather than merely acting as the getaway driver, Dickens drove through the rest stop to, in his words, verify that “everything was taken care of’ and pick up Amaral. Thus, the Arizona Supreme Court did not unreasonably conclude that Dickens was a major participant in the Bernsteins’ robbery and murder.[11]
B. Reckless indifference to human life
The second prong of the Tison analysis requires the felony-murder defendant to exhibit “reckless indifference to human life” sufficient to satisfy Enmund’s culpability requirement for capital punishment. 481 U.S. at 158, 107 S.Ct. 1676. The Tison Court observed that
some nonintentional murderers may be among the most dangerous and inhumane of all — the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim’s property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an “intent to kill.”
*1314 Id. at 157, 107 S.Ct. 1676. The Tison court further held that “the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state” sufficient to warrant capital punishment “when that conduct causes its natural, though also not inevitable, lethal result.” Id. at 157-58, 107 S.Ct. 1676 (emphasis added).
Applying Tison, the Arizona Supreme Court concluded that Dickens acted with a reckless indifference to human life, because, in addition to the factors demonstrating his major contribution to the crimes, Dickens armed Amaral with the .38-caliber revolver, knowing that “Amaral had a violent and explosive temper,” and “failed to render aid” to the Bernsteins. Dickens, 926 P.2d at 490. Given these facts, the Arizona Supreme Court concluded that Dickens exhibited a reckless indifference to human life.
Dickens argues that this conclusion was unreasonable, because armed robbery is not a crime “known to carry a grave risk of death.” However, Dickens cites no U.S. Supreme Court precedent, and we know of none, clearly establishing this principle. Moreover, even if the garden variety armed robbery were not known to carry a grave risk of death, the question here is whether the circumstances of Dickens’s crime carried a grave risk of death and caused their “natural, though also not inevitable, lethal result.” Tison, 481 U.S. at 158, 107 S.Ct. 1676.
The facts support the Arizona Supreme Court’s determination that Dickens knew there was a grave risk of death in sending an explosive adolescent with a history of violence to commit armed robbery. From his experience working at the Oak Grove Institute (a treatment center for violent juveniles), Dickens knew that Amaral was a high risk patient with a “violent and explosive temper.” Dickens, 926 P.2d at 490. He knew that Amaral had battered a nurse at Oak Grove and had a long history of carrying guns. He knew that Amaral was reckless in his handling of guns since Amaral twice attempted to intimidate Dickens — once at the river and once immediately before the robbery — by pointing the loaded .38-caliber revolver at Dickens’s head. He knew that Amaral had bragged about being involved in other murders. Yet even with this knowledge, Dickens proceeded with the robbery. He either furnished Amaral with his .38-cali-ber revolver or knew Amaral had the gun, and stood by while Amaral left with the gun to rob the Bernsteins on the opposite side of the highway. Like the defendants in Tison, who armed two convicted murderers and helped plan and orchestrate the armed robbery, Dickens “could have foreseen that lethal force might be used” in the course of the robbery. 481 U.S. at 151-52, 107 S.Ct. 1676; accord Foster v. Quarterman, 466 F.3d 359, 370-71 (5th Cir.2006) (denying habeas relief to a death row petitioner because he displayed reckless indifference to human life by driving two armed co-conspirators from victim to victim to commit armed robbery, a criminal activity “known to carry a grave risk of death”).
Furthermore, after watching the shootings, Dickens, like the defendants in Tison, chose to “aid [Amaral,] whom he had placed in the position to kill rather than [aid] their victims.” Tison, 481 U.S. at 152, 107 S.Ct. 1676; see id. (“These facts not only indicate that the Tison brothers’ participation in the crime was anything but minor; they also would clearly support a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life.”). Dickens helped Amaral flee the scene of the murder, destroy evidence, and evade *1315 capture. In light of these facts, we cannot say that the Arizona Supreme Court’s determination that Dickens exhibited a reckless indifference to human life rested on an objectively unreasonable application of Enmund and Tison.
II. The Arizona Supreme Court’s decision was not based on an unreasonable determination of fact.
To avoid the bar against granting habe-as relief imposed by § 2254(d)(2), a defendant must show the state court’s conclusion “to be ‘an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.’ ” Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (quoting 28 U.S.C. § 2254(d)(2)). A trial court’s findings are presumed sound unless the defendant rebuts the “presumption of correctness by clear and convincing evidence.” 28 U.S.C. § 2254(e)(1).
Dickens argues that he is entitled to relief because the Arizona court’s En-mund/Tison analysis was based on an unreasonable determination of the facts. More specifically, Dickens argues that the state court unreasonably determined that: (1) Amaral was a sufficiently credible witness; (2) Dickens knew Amaral intended to rob or kill the Bernsteins; (3) Dickens knew of Amaral’s violent propensities; and (4) Dickens knew one of the Bernsteins might still be alive when he left the rest area.
We reject Dickens’s claim arising from Amaral’s alleged lack of credibility. To support this claim, Dickens alleges that Amaral made inconsistent statements, Amaral’s fellow prisoners gave contradictory testimony, and the jury rejected Amaral’s testimony about an alleged walk-ie-talkie conversation between Dickens and Amaral at the murder scene.[12] Aside from casting doubt on Amaral’s credibility — a factor which the state court and jury no doubt considered at trial[13] — these general allegations do little more than attempt to relitigate the jury’s factual findings and credit Dickens’s testimony (over that of Amaral) that he had no part in the crimes. Because we must “defer to the jury and the [trial] judge regarding Amaral’s credibility” unless there is persuasive evidence that any particular determination of fact was unreasonable, Dickens cannot prevail under § 2254(d)(2) by raising a general challenge to Amaral’s credibility. Dickens, 926 P.2d at 490; see United States v. Johnson, 229 F.3d 891, 894 (9th Cir.2000) (“[W]e are powerless to question a jury’s assessment of witnesses’ credibility....” (internal quotation marks omitted)).
We also reject Dickens’s claims arising from the alleged insufficiency of evidence at trial. Ample evidence supported the conclusion that Dickens knew that Amaral intended to rob the Bern-steins. Dickens himself testified that he knew about the robbery. Most significantly, he admitted that he “figured [Amaral] was going to ... go over there and rob those people,” and that Amaral told him he was going to rob the Bernsteins. Moreover, Amaral testified at length about their common scheme to commit armed robbery. *1316 Dickens has not explained why the Arizona courts’ reliance on this particular testimony from Amaral was unreasonable. In light of this evidence, the Arizona Supreme Court’s determination that Dickens knew about and agreed to the robbery was not unreasonable.
Similarly, the record supports the Arizona courts’ determination that Dickens knew about Amaral’s violent propensities. Dickens originally met Amaral at the Oak Grove Institute for violent juveniles. Dickens learned, while working at Oak Grove, that Amaral was a “high risk” patient, had battered a nurse, and frequently bragged about carrying guns and committing violent crimes, including murder. He further testified that he had personally seen Amaral carrying guns on several occasions before the September 1991 murders. Lastly, Amaral pointed a .38-caliber revolver at Dickens’s head on two separate occasions to intimidate him. One occasion was just prior to the robbery. In light of Dickens’s own admissions, we cannot say the Arizona Supreme Court’s determination that Dickens knew of Amaral’s violent nature was unreasonable.
Finally, the facts support the Arizona courts’ determination that Dickens “failed to render aid knowing that one victim might not be dead” and thus exhibited reckless indifference to human life. Dickens, 926 P.2d at 490. However, it was not necessary to the Arizona court’s reckless indifference finding that Dickens knew that “one victim might not be dead.” In Tison, the U.S. Supreme Court concluded that the defendants exhibited reckless indifference, in part, because they “watched the killing” and then “chose to aid those whom [they] had placed in the position to kill rather than their victims.” 481 U.S. at 152, 107 S.Ct. 1676. Nothing suggests the defendants in Tison knew anyone had survived. Rather, the relevant factors were the defendants’ knowledge that victims had been shot and their decision to aid the shooters over the victims.
Dickens, like the Tison defendants, watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins by picking him up and driving him to his brother’s home. There is no evidence that Dickens attempted to aid the Bernsteins, summon medical assistance, or otherwise notify the authorities. Instead, he helped Amaral. Because Dickens’s uncontested knowledge of the Bernsteins’ shooting, rather than Bryan’s survival, is the critical factor in the Enmund/Tison reckless indifference analysis, the Arizona Supreme Court did not “base” its decision on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2).[14]
III. Dickens defaulted on his IAC claim by failing to fairly present the claim to the Arizona courts, but he may be able to show “cause” under Martinez v. Ryan.
Dickens lastly petitions this court for habeas relief on the basis of his counsel’s ineffective assistance during sentencing. Dickens argues his counsel failed to conduct a thorough investigation of Dickens’s background and prepare the defense expert with the necessary tools to present compelling mitigation evidence. Dickens claims that trial counsel should have obtained and introduced additional mitigating evidence, including evidence that Dickens *1317 suffered from organic brain damage and FAS.
“A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court.” Peterson v. Lampert, 319 F.3d 1153, 1155 (9th Cir.2003) (en banc) (citing 28 U.S.C. § 2254(b)); see also Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). To demonstrate that he exhausted his federal habeas corpus claim in state court, Dickens’s claim presented in state court “must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle [him] to relief.” Gray v. Netherlands 518 U.S. 152, 162-63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court. See Beaty v. Stewart, 303 F.3d 975, 987 (9th Cir.2002).
Here, we conclude that Dickens’s claim is procedurally defaulted, because he never presented it to the state courts and would now be barred from doing so. However, remand is appropriate to allow the district court to evaluate whether Dickens can show cause and prejudice under Martinez.
A. Background
Dickens argued to the Arizona trial court that his sentencing counsel provided ineffective assistance. Dickens claimed, among other things, that sentencing counsel did not direct the work of the court-appointed psychologist and did not adequately investigate Dickens’s background. The trial court rejected this claim on the merits, finding that sentencing counsel’s performance was not constitutionally deficient and that Dickens “failed to demonstrate that he was prejudiced by any performance of defense counsel.” Considering the same arguments raised to the trial court, the Arizona Supreme Court summarily denied Dickens’s Strickland claim on appeal.
In federal court, Dickens changed his claim to include extensive factual allegations suggesting Dickens suffered from FAS and organic brain damage. Dickens argued that sentencing counsel’s failure to uncover and present these specific mitigating conditions amounted to constitutionally deficient performance. The state argued that Dickens procedurally defaulted any claim based on these new allegations by failing to present the allegations and evidence to the state court.
The district court agreed with the state’s procedural default argument. The district court noted that “[fjactual allegations that were not presented to the state court may render a claim unexhausted if the allegations ‘fundamentally alter’ ” the claim presented to the state court. See Vasquez v. Hillery, 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). The district court also observed that “[n]ew evidence fundamentally alters a claim if it places the claim in a significantly different and stronger evidentiary posture than it had in state court.” Aiken v. Spalding, 841 F.2d 881, 883, 884 n. 3 (9th Cir.1988). The district court concluded that Dickens’s new allegations and proffered evidence fundamentally altered his previously exhausted IAC claim, rendering it “partially unex-hausted and procedurally defaulted.”
The district court also rejected Dickens’s argument that ineffective assistance of his post-conviction relief (“PCR”) counsel constituted “cause” to overcome the procedural default. The district court reasoned that Dickens had no constitutional right to effective PCR counsel, making it insufficient to show cause under Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, *1318 115 L.Ed.2d 640 (1991). Thus,' the district court declined to -reach the merits of Dickens’s “new” IAC claim and denied Dickens’s request for an evidentiary hearing.
Dickens challenged the district court’s conclusion concerning exhaustion and cause before the three judge panel of this court. The state maintained its position that Dickens failed to exhaust the “new” IAC claim, rendering it procedurally defaulted. However, after this case was submitted, the Supreme Court decided Martinez. In Martinez, the Court modified “the unqualified statement in Coleman that an attorney’s ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default.” — U.S. -, 132 S.Ct. 1309, 1315, 182 L.Ed.2d 272 (2012). Martinez created a narrow exception to Coleman whereby “[inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner’s procedural default of a claim of ineffective assistance at trial.”[15] Id.
The panel ordered the parties to address the effect of Martinez on Dickens’s “new” IAC claim. The panel rejected the state’s various arguments that Martinez does not apply to Dickens’s claim. The panel unanimously decided to remand the case to the district court to consider whether Dickens could show cause to overcome his procedural default. For the reasons stated below, we too conclude that remand is appropriate under Martinez.
B. Although Dickens procedurally defaulted his “new” IAC claim, Dickens may be able to show cause and prejudice under Martinez.
1. Fair presentation in state court
As an initial matter, we agree with the district court that Dickens failed to exhaust his “new” IAC claim. To exhaust a constitutional claim, the claim must be “fairly presented]” in state court to provide the state courts an opportunity to act on them. Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam). A claim has not been fairly presented in state court if new factual allegations either “fundamentally alter the legal claim already considered by the state courts,” Vasquez, 474 U.S. at 260, 106 S.Ct. 617; Beaty, 303 F.3d at 989-90, or “place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.” Aiken, 841 F.2d at 883; accord Nevius v. Sumner, 852 F.2d 463, 470 (9th Cir.1988).
In Aiken, the habeas petitioner presented new evidence consisting of a decibel sound test performed by an expert which strengthened his claim that the interrogating officers heard him request counsel. 841 F.2d at 883. The court held that his right to counsel claim was unexhausted, because the new decibel evidence “substantially improve[d] the evidentiary basis for [his] right-to-counsel and voluntariness arguments, thereby presenting the very type of evidence which the state should consider in the first instance.”[16] Id.
*1319 Similarly, in Nevius, this Court held that a habeas petitioner failed to exhaust his Batson claim in state court where he attempted to introduce new and substantial supporting evidence on appeal. 852 F.2d at 469-70. At oral argument and in his appellate briefs, Nevius made allegations concerning comments the prosecutor allegedly made to defense counsel. The comments, “if proven, might have presented in a different light the factual issues concerning the motivation of the prosecutor in exercising his peremptory challenges.” Id. at 470. However, because the alleged remarks were not previously presented in a state court, this court found that the claims were unexhausted and not addressable in federal court.
We conclude that the new allegations and evidence Dickens presented to the federal district court fundamentally altered Dickens’s previously exhausted IAC claim. Indeed, the new evidence creates a mitigation case that bears little resemblance to the naked Strickland claim raised before the state courts. There, Dickens did not identify any specific conditions that sentencing counsel’s allegedly deficient performance failed to uncover. He only generally alleged that sentencing counsel did not effectively evaluate whether Dickens “suffer[ed] from any medical or mental impairment.” This new evidence of specific conditions (like FAS and organic brain damage) clearly places Dickens’s Strickland claim in a “significantly different” and “substantially improved” evidentiary posture. See Nevius, 852 F.2d at 470; Aiken, 841 F.2d at 883. As such, the Arizona courts did not have a fair opportunity to evaluate Dickens’s altered IAC claim. Therefore, the district court correctly determined that Dickens’s newly enhanced Strickland claim is procedurally barred.
2. Cause and Prejudice under Martinez
Martinez announced an exception to the longstanding Coleman rule that ineffective assistance of PCR counsel cannot establish cause to overcome procedural default. 132 S.Ct. at 1315. The Supreme Court held:
Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.
Id. at 1320. As such, to establish “cause” to overcome procedural default under Martinez, a petitioner must show: (1) the underlying ineffective assistance of trial counsel claim is “substantial”; (2) the petitioner was not represented or had ineffective counsel during the PCR proceeding; (3) the state PCR proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding. Trevino v. Thaler,— U.S.-, 133 S.Ct. 1911, 1918, 185 L.Ed.2d 1044 (2013).
Here, there is no dispute with respect to elements (3) and (4), because Arizona does not permit a petitioner to bring an IAC claim on direct appeal. Martinez, 132 S.Ct. at 1313, 1320. Arizona law requires a petitioner to bring such a claim in a collateral review proceeding. Id. The district court, applying the law as it stood *1320 at that time, correctly held that Dickens could not establish cause for his procedural default based on the alleged ineffectiveness of his PCR counsel. However, Martinez may provide a path for Dickens to demonstrate cause, .if he can show the first two Martinez elements: (1) the claim is substantial and (2) that his PCR counsel was ineffective under Strickland. Thus, we vacate the district court’s ruling regarding whether cause existed to overcome the procedural default of Dickens’s newly-enhanced claim of ineffective assistance of sentencing counsel. We remand for the district court to consider the issue anew in light of Martinez. See Strategic Diversity, Inc. v. Alchemix Corp., 666 F.3d 1197, 1206 (9th Cir.2012) (“Because the district court did not have the benefit of recent Supreme Court authority, we vacate the ruling on these grounds and remand.”).
The state presents various arguments to convince us that Dickens is not entitled to remand under Martinez and that our conclusion would contravene Cullen v. Pinholster,—U.S.-—, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), which the Supreme Court decided during the pendency of this appeal. We decline to address many of these arguments based on our remand regarding the applicability and impact of Martinez. However, we provide guidance to the district court on the following points: (a) Pinholster’s potential effect on Dickens’s “new” IAC claim; (b) the effect of Dickens’s other IAC claims on the “new” claim; and (c) whether § 2254(e)(2) bars Dickens’s request for an evidentiary hearing on remand.
a. Pinholster
We reject any argument that Pinholster bars the federal district court’s ability to consider Dickens’s “new” IAC claim. The state argues that the district court cannot consider new allegations or evidence proffered for the first time to the district court. In Pinholster, the Supreme Court made clear that a federal habeas court may not consider evidence of a claim that was not presented to the state court. 131 S.Ct. at 1398. However, this prohibition applies only to claims previously “adjudicated on the merits in State court proceedings.” Id. at 1401; see also 28 U.S.C. § 2254(d).
Pinholster does not bar Dickens from presenting evidence of his “new” IAC claim, because the claim was not “adjudicated on the merits” by the Arizona courts. While the Arizona courts did previously adjudicate a similar IAC claim, the new allegations and evidence “fundamentally altered” that claim, as discussed above. See, e.g., Aiken, 841 F.2d at 883. Pinholster says nothing about whether a court may consider a “new” claim, based oh “new” evidence not previously presented to the state courts. See 131 S.Ct. at 1401 n. 10. Indeed, the Pinholster court expressly declined to “decide where to draw the line between new claims and claims adjudicated on the merits.” Id. Thus, Pin-holster does not affect earlier cases like Vasquez, Aiken, and Nevius, or a federal habeas court’s ability to consider new evidence where the petitioner successfully shows cause to overcome the procedural default.
b. Dickens’s “Other” IAC Claims
We reject the similar argument that Dickens’s other IAC claims, which were previously “adjudicated on the merits” by the Arizona Courts, foreclose the new IAC claim. Martinez allows a petitioner to argue “cause” based on PCR counsel’s ineffectiveness for counsel’s failure to raise a substantial trial counsel IAC claim. 132 S.Ct. at 1318-19. Martinez contains no language limiting this “equitable exception” simply because a petitioner brought *1321 other IAC claims that were exhausted. See id. Because courts evaluate procedural default on a claim-by-claim basis, it follows that Martinez would allow a petitioner to show cause, irrespective of the presence of other, separate claims.
c. Dickens’s Request for an Evidentiary Hearing
We also reject the state’s argument that, even if Martinez applies to the standard for Dickens to show cause, § 2254(e)(2) will bar Dickens from introducing the new evidence to the district court. Petitioners seeking habeas relief cannot obtain an evidentiary hearing on their claims unless they comply with § 2254(e)(2). Section 2254(e)(2) severely restricts a petitioner’s ability to obtain a hearing on a claim for relief where the petitioner “failed to develop the factual basis of a claim in State court proceedings” due to “a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner’s counsel.” See Lopez v. Ryan, 630 F.3d 1198, 1206 (9th Cir.2011). A petitioner’s attorney’s “fault” is generally attributed to the petitioner for purposes of § 2254(e)(2)’s diligence requirement. See Williams v. Taylor, 529 U.S. 420, 437-40, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).
Section 2254(e)(2), however, does not bar a hearing before the district court to allow a petitioner to show “cause” under Martinez. When a petitioner seeks to show “cause” based on ineffective assistance of PCR counsel, he is not asserting a “claim” for relief as that term is used in § 2254(e)(2); indeed, such a claim of ineffective assistance of PCR counsel is not a constitutional claim. See Martinez, 132 S.Ct. at 1319-20. Instead, the petitioner seeks, on an equitable basis, to excuse a procedural default. See id. A federal court’s determination of whether a habeas petitioner has demonstrated cause and prejudice (so as to bring his case within Martinez’s judicially created exception to the judicially created procedural bar) is not the same as a hearing on a constitutional claim for habeas relief. See Coleman, 501 U.S. at 750, 111 S.Ct. 2546 (recognizing the “cause and prejudice” exception to procedural default); Woodford v. Ngo, 548 U.S. 81, 91, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (“[H]abeas law includes the judge-made doctrine of procedural default”); Dretke v. Haley, 541 U.S. 386, 394, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004) (describing the “various exceptions to the procedural default doctrine” as “judge-made rules”). Therefore, a petitioner, claiming that PCR counsel’s ineffective assistance constituted “cause,” may present evidence to demonstrate this point. The petitioner is also entitled to present evidence to demonstrate that there is “prejudice,” that is that petitioner’s claim is “substantial” under Martinez. Therefore, a district court may take evidence to the extent necessary to determine whether the petitioner’s claim of ineffective assistance of trial counsel is substantial under Martinez.
The facts and procedural posture of Dickens’s case illustrate this point. Dickens had a new claim of ineffective assistance of counsel. Because the claim was new, it was procedurally defaulted (thus technically exhausted). However, if Dickens can show cause and prejudice to excuse a procedural default, AEDPA no longer applies and a federal court may hear this new claim de novo. Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.2002). Martinez may provide a means to show “cause” to overcome the default and reach the merits of the new claim. Because § 2254(e)(2) by its terms does not prevent consideration of the substantive evidence of the claim to the extent necessary to determine if Dickens has successfully *1322 proven “cause,” Dickens will have a fair opportunity to show cause and prejudice so as to overcome the procedural bar of the otherwise defaulted claim. See Martinez, 132 S.Ct. at 1317.[17] Thus, § 2254(e)(2) does not bar a cause and prejudice hearing on Dickens’s claim of PCR counsel’s ineffectiveness, which requires a showing that Dickens’s underlying trial-counsel IAC claim is substantial.
CONCLUSION
For the foregoing reasons, the judgment of the district court denying Dickens’s petition for writ of habeas corpus is
AFFIRMED in part, VACATED in part, and REMANDED.
The parties shall bear their own costs.

. Dickens raises other uncertified issues on appeal, which we address in a separate Memorandum Disposition filed concurrently with this Opinion.

. These facts are drawn substantially from the Arizona Supreme Court's opinion in State v. Dickens, 187 Ariz. 1, 926 P.2d 468, 474-75 (1996) (in banc). We presume the correctness of the Arizona court’s findings unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

. Bryan and Laura were both 22 years old. They had been married for three years and graduated from Cornell University. When they were murdered, they were traveling through Arizona en route to UCLA where they both received fellowships to undertake graduate work.
The jury heard evidence that the Bernsteins were not the first car to enter the rest area during the three hours that Dickens and Amaral waited for victims. Amaral testified that between four and six other cars entered and exited the rest area before the Bernsteins arrived. At some point, a car full of six people entered. Dickens asked Amaral whether Amaral thought he could “pull off” the robbery of those people or whether Amaral wanted to wait for "something easier.” Amaral responded that they should wait, because six people were "too many for the amount of bullets [they] had.” While we mention this testimony, we omit it from our statement of facts, and do not rely on it in our Enmund/Tison analysis below, because the Arizona Supreme Court did not rely on this testimony in its discussion of the evidence supporting the Enmund/Tison findings. See Dickens, 926 P.2d at 490-91.

. The Arizona Supreme Court noted that “Amaral also testified that he carried a two-way walkie-talkie that [Dickens] had given him, and [Dickens] had one with him in his truck.” 926 P.2d at 474. And that “Speaking through the walkie-talkie, [Dickens] then told Amaral, 'No witnesses.’ Amaral asked, 'What?' [Dickens] replied, 'You know what I mean, no witnesses.’ Amaral responded, ‘What do you mean by no witness? If I kill them, there are no witnesses; If I leave them here, there are witnesses.' [Dickens] replied, ‘No witnesses.’ ” Id. The district court also relied on this factual summary. However, Dickens presented evidence at trial showing that Amaral's statements were inconsistent and that his testimony was contradicted by his fellow prisoners. Ultimately, the Assistant Attorney General conceded before the Arizona Supreme Court that "the one part the jurors and trial court didn't believe, was the talk about the walkie-talkie” and that the Arizona Supreme Court "shouldn’t believe, the walkie-talkie testimony.” Thus, we omit from our factual summary any reference to the alleged walkie-talkie conversation. However, the jury’s disbelief of the walkie-talkie testimony does not show that the Arizona Supreme Court’s decision was unreasonable, because the court did not rely on this testimony in its discussion of the evidence supporting the En-mund/Tison findings. See Dickens, 926 P.2d at 490-91.

. This information was not provided to the jury.

. The district court sentenced Dickens to death prior to the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that juries (rather than courts) must determine the presence or absence of aggravating factors meriting imposition of the death penalty. The procedural rule announced in Ring "does not apply retroactively to cases already final on direct review.” Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

. "A decision can be 'contrary to’ federal law in one of two ways: if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases,’ or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent.' ” Brown v. Horell, 644 F.3d 969, 978 (9th Cir.2011) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). In contrast, "a decision is an 'unreasonable application’ of clearly established federal law” in cases where the state court identified “the correct legal principle from [the Supreme Court’s] decisions but unreasonably applies that principle to the facts of the prisoner's case.” Cunningham v. Wong, 704 F.3d 1143, 1153 (9th Cir.2013) (internal quotation marks omitted). Here, the Arizona Supreme Court recognized Enmund and Tison as the relevant precedent, so only the "unreasonable application” prong of § 2254(d)(1) is at issue.

. The Court remanded for further proceedings to determine whether the defendants acted with reckless disregard for human life. Tison, 481 U.S. at 158, 107 S.Ct. 1676.

. The Arizona Supreme Court’s decision is (arguably) vague as to whether Dickens armed Amaral. The Arizona Supreme Court, in its "Death eligibility” discussion, noted only that Dickens either furnished the weapon or knew Amaral had the weapon. Dickens, 926 P.2d at 490. However, it is irrelevant whether Dickens actually handed Amaral the gun in the moments before the Bernsteins’ robbery and murder. Dickens does not dispute that he owned the gun and showed it to Amaral prior to the crimes. As such, Dickens “furnished” the gun by owning it, showing it to Amaral, and either giving it to him or knowingly allowing him to use it for the crimes.

. There was apparently some dispute as to the Tison defendants’ involvement in, and proximity to, the murders: “Ricky claimed to have a somewhat better view than Raymond did of the actual killing. Otherwise, the [Arizona] court noted, Ricky Tison’s participation was substantially the same as Raymond’s." 481 U.S. at 145, 107 S.Ct. 1676. The defen *1313 dants may have actually walked away from the murder scene to fetch a water jug for the victims “when [they] started hearing the shots.” Id. at 141, 107 S.Ct. 1676. However, because both defendants "watched Gary Tison and Greenawalt fire in the direction of the victims,” they were “present” at the murder scene. Id. at 141, 144-45, 157, 107 S.Ct. 1676 (emphasis added).

. At the en banc oral argument, Dickens argued that, because Enmund was found not present at the scene of the murders when he was 200 yards away, and Dickens was approximately 199 yards from the murders, Dickens could not have been present at the scene. However, this argument is not supported by the record. We know that Dickens got much closer: While the crime was still ongoing — and while at least one of the victims was still alive — Dickens “drove across the median to the westbound lanes, where he picked up Amaral.” Dickens, 926 P.2d at 475. Unlike Enmund, who sat "waiting to help the robbers escape,” Enmund, 458 U.S. at 788, 102 S.Ct. 3368, Dickens drove toward the scene, not to aid the victims, but "to aid those whom he had placed in the position to kill.” Tison, 481 U.S. at 152, 107 S.Ct. 1676. It is unclear from- the record exactly how close Dickens was, but it was certainly much less than 200 yards.
In any event, the Supreme Court has never defined a set distance between the defendant and the murders to constitute presence. Determining whether a defendant was present based solely on how many yards the defendant was from the crime ignores important contextual factors.

. Amaral’s testimony regarding the walkie-talkie conversation (in which Dickens allegedly instructed Amaral not to leave any witnesses) is irrelevant because neither the trial court nor the Arizona Supreme Court relied on this testimony in their discussion of the evidence supporting the Enmund/Tison findings. See Dickens, 926 P.2d at 490-91.

. For example, the jury did not convict Dickens of premeditated murder or conspiracy to commit murder, indicating it likely did not believe Amaral’s testimony that Dickens ordered him to kill the Bernsteins over a two-way radio.

. Evidence in the record also supports this factual determination. For example, Amaral testified that Dickens drove through the rest stop to verify that “everything had been taken care of.” Officers testified that, when they arrived at the rest stop shortly after the shooting, Bryan Bernstein was still alive and "thrashing” around in pain. At a minimum, Dickens failed to provide aid when one victim was, in fact, still alive.

. Martinez defines an initial-review collateral proceedings as “collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.” Martinez, 132 S.Ct. at 1315.

. Our holdings in Aiken and Nevius are consistent with case law in other circuits. See, e.g., Smith v. Quarterman, 515 F.3d 392, 402 (5th Cir.2008) (dismissing habeas petition for failure to exhaust because new evidence "regarding [petitioner]^ childhood and the effects of his substance abuse ... constitute 'material additional evidentiary support [presented] to the federal court that was not presented to the state court’ ” (citation omitted)); Demarest v. Price, 130 F.3d 922, 938-39 (10th Cir.1997) (finding failure to exhaust because "new evidence submitted to the district court *1319 by [the petitioner] transformed his ineffective assistance of counsel claim into one that was 'significantly different and more substantial' ” (citation omitted)).

. The state argues that Martinez does not apply, because the assertion of ineffective assistance of PCR counsel as cause must itself be exhausted or it is procedurally barred. It is true that "the exhaustion doctrine ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.” Murray v. Carrier, 477 U.S. 478, 488-89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (citation omitted). However, the case law in light of Martinez now indicates that there is no requirement that a petitioner assert an ineffective assistance of PCR counsel claim as cause in state court in order to demonstrate cause in federal court. In Martinez, the first time the petitioner argued ineffective assistance of PCR counsel was in his federal habeas petition. See Martinez, 132 S.Ct. at 1314; Martinez v. Schriro, 623 F.3d 731, 734 (9th Cir.2010), rev’d by Martinez, 132 S.Ct. 1309. The Supreme Court did not find the claim barred for not being presented to the state courts. Therefore, where Martinez applies, there seems to be no requirement that the claim of ineffective assistance of PCR counsel as cause for an ineffective-assistance-of-sentencing-counsel claim be presented to the state courts.