**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DWAYNE ANTHONY WOODS,
*Petitioner-Appellant*,

v.

STEPHEN SINCLAIR,
*Respondent-Appellee*.

No. 09-99003

D.C. No.
2:05-CV-00319-LRS

OPINION

On Remand From The United States Supreme Court

Filed August 25, 2014

Before: Richard A. Paez, Richard C. Tallman,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Tallman

## SUMMARY[*]

### Habeas Corpus/Death Penalty

On remand from the United States Supreme Court, the panel affirmed in part and vacated in part the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for two counts of aggravated murder in the first degree and one count of attempted murder in the first degree, and remanded for the district court to consider in the first instance whether the petitioner can show cause and prejudice under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), excusing procedural default on certain claims of ineffective assistance of counsel.

The panel held that the state court did not unreasonably deny petitioner's claim under *Faretta v. California*, 422 U.S. 806 (1975), because he had not made an unequivocal request for self-representation.

The panel held that the state court did not unreasonably deny petitioner's claim that he was denied his Confrontation Clause rights when the trial court admitted into evidence the deceased victim's statements to the police because they fell within the medical diagnosis exception to the hearsay rule. The panel held that the state court unreasonably applied *White v. Illinois*, 502 U.S. 346 (1992), by determining some of the victim's statements were excited utterances, but that the error was harmless because those statements were cumulative.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the state court's decision was neither contrary to nor an unreasonable application of *Brady v. Maryland*, 373 U.S. 83 (1963), and did not involve an unreasonable factual determination when the state court denied petitioner's contention that the prosecution should have disclosed the crime lab's DNA testing review process (including peer review and destruction of erroneous draft reports) because that evidence was not exculpatory.

The panel rejected as procedurally barred petitioner's claim of a *Brady* violation in the state's failure to disclose the full details of the spillage of one of petitioner's blood samples at the crime lab.

The panel affirmed the denial of several of petitioner's claims of ineffective assistance of counsel on the merits and/or for lack of prejudice.

The panel agreed with the parties and the district court that two of petitioner's ineffective-assistance claims regarding DNA evidence were procedurally defaulted. The panel remanded to the district court so that it may determine in the first instance whether these claims are substantial and whether post-conviction-relief counsel was ineffective for failing to raise them, thereby excusing, under *Martinez*, the procedural default.

The panel vacated the district court's ruling that the petitioner's claim that he received ineffective assistance when his trial counsel failed to impeach witness Venus Shaver was procedurally barred, and remanded so that the district court may consider in the first instance whether the petitioner can show cause and prejudice under *Martinez*.

The panel affirmed the denial of relief on the petitioner's claim of cumulative deficiency.

Concurring in part and dissenting in part, Judge Tallman wrote that because none of the petitioner's new claims would lead a reasonable juror to conclude that the petitioner did not commit the murders or the attempted murder, no court can provide the relief he seeks and the majority's remand serves only one purpose: unnecessary delay.

## COUNSEL

Suzanne Lee Elliott, Law Offices of Suzanne Lee Elliott, Seattle, Washington, and David B. Zuckerman, Law Offices of David B. Zuckerman, Seattle, Washington, for Petitioner-Appellant.

John Joseph Samson, Assistant Attorney General, Olympia, Washington, for Respondent-Appellee.

## OPINION

PAEZ, Circuit Judge:

In 1997, a Washington jury found Dwayne A. Woods guilty of two counts of aggravated murder in the first degree, one count of attempted murder in the first degree, and one count of attempting to elude a police vehicle. After two days of deliberation, the jury sentenced Woods to death. The Washington State Supreme Court upheld his conviction and sentence, *State v. Woods*, 23 P.3d 1046 (Wash. 2001), and denied his petition for post-conviction relief, *In re Woods*,

114 P.3d 607 (Wash. 2005). Woods then filed a petition for a writ of habeas corpus in federal district court, which was denied. Woods appeals from the denial of habeas relief, contending that (1) he was denied his Sixth Amendment right to represent himself, (2) the state court's admission of certain evidence violated the Confrontation Clause, (3) the State withheld material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (4) his trial counsel's representation was ineffective.[1] We have jurisdiction under 28 U.S.C. § 1291.

In a previous opinion filed on August 10, 2011, we affirmed the district court's order denying Woods's habeas corpus petition. *Woods v. Sinclair*, 655 F.3d 886, 891 (9th Cir. 2011). On March 26, 2012, the Supreme Court granted Woods's petition for certiorari, vacated our opinion, and remanded the case for further consideration in light of *Martinez v. Ryan*, 566 U.S. —, 132 S. Ct. 1309 (2012). In May 2012, we ordered the parties to file supplemental briefs addressing the impact of *Martinez* and *Sexton v. Cozner*, 679 F.3d 1150, 1153 (9th Cir. 2012) on this case. That same month, a petition for rehearing en banc was granted in *Detrich v. Ryan*, 677 F.3d 958 (9th Cir. 2012). *Detrich* also involved *Martinez* issues. The parties' supplemental briefs addressing *Martinez* and *Sexton* were filed before the en banc

---

[1] Woods also alleges that the State violated his due process rights when it misled the court and defense as to the progress of a DNA test during several hearings. This claim, claim 6.1 in Woods's federal habeas petition, was not included in the Certificate of Appealability ("COA"). Although the prosecution failed to act with proper diligence in the completion of the DNA testing, we agree with the State that there was no prejudice from any failure to notify Woods of the reasons for the delay. Because we conclude that the claim lacks merit, we decline to grant a COA.

court in *Detrich* filed its opinion on September 3, 2013. 740 F.3d 1237, 1262 (9th Cir. 2013) (en banc). We ordered further supplemental briefing on the impact of *Detrich*. The parties' supplemental briefs were filed on September 27, 2013. With the exception of the claims affected by *Martinez*, we again affirm the district court's rulings on the remaining claims for all the reasons set forth in our original opinion. We vacate the district court's ruling as to the claims affected by *Martinez* and remand for further proceedings in light of that case.

## I. THE CRIME[2]

On Friday, April 26, 1996, Telisha Shaver was house-sitting at her aunt's trailer home in Spokane Valley, Washington. Telisha[3] planned to spend the night at her boyfriend's home, but had agreed to let her sister, Venus, and Venus's friend, Jade Moore, spend the night at the trailer. Venus and Jade arrived at the trailer at approximately 1:45 a.m. on Saturday morning. The women drank alcohol and socialized. At some point, Venus and Jade decided to contact Dwayne Woods, whom Venus had previously dated. After the women paged Woods, he eventually joined them at the trailer. By that time, approximately 4:20 a.m., Jade was asleep.

---

[2] This factual background is taken largely from the Washington State Supreme Court's opinion affirming Woods's conviction and sentence. *See Woods*, 23 P.3d at 1053–59.

[3] In this opinion we frequently refer to Telisha and Venus Shaver by their first names for the sake of clarity. We also refer to Jade Moore by her first name to avoid confusion with her father, Barry Moore.

While at the trailer, Woods served himself alcohol and talked with Venus. According to Venus's testimony, Woods was upset that Jade was asleep and urged Venus to wake her up. Venus tried to wake Jade up, but Jade did not respond. At this, Woods became irate and, according to Venus, shoved her onto the couch and attempted to unbutton her pants. Venus said that she initially escaped Woods's grasp, but that he managed to grab her again and then slammed her head and neck against a door. Venus testified that she has no memory of what transpired from that point forward except for intermittent flashes of memory in which she recalls struggling with Woods.

At approximately 7:30 a.m., Woods forced Jade to wake up at knife point. He took her to another one of the bedrooms, where Venus lay unconscious and severely beaten. Woods forced Jade to help him loot the trailer and to give him her ATM card and personal identification number. He then raped Jade orally and vaginally.

During the attack on Jade, Telisha returned to the trailer to retrieve some personal effects. Woods seized and bound her. Jade, who was laying on the floor and feigning unconsciousness, later stated that she heard a baseball bat hit Telisha's head. Jade said that she was then hit in the head with the bat, knocked unconscious, and had no memory of what happened after that point.

When Telisha failed to return home that morning, her mother, Sherry Shaver, decided to go to the trailer to check on her. She arrived at approximately 10:25 a.m. and found the door locked. Peering through a window in the trailer, she saw a man—whom she later identified as Woods—exiting from the other side of the trailer. She pounded on the locked

trailer door, and Jade, naked and beaten, eventually opened the door. Sherry Shaver called 911.

Emergency personnel arrived at the trailer and took the victims to the hospital. While en route to the hospital, Jade told a paramedic about the events of the prior evening. At the hospital, she also told her father, the emergency room physician, and a nurse about what had transpired. Of the three victims, only Venus survived. Telisha died without ever regaining consciousness. Despite initially responding to medical treatment, Jade died the following day.

Shortly after Sherry Shaver reported seeing Woods leave the trailer, he was seen at two local businesses close to the crime scene. At one of those businesses, Woods convinced another patron to drive him to downtown Spokane. Within close proximity to where Woods was dropped off, a series of cash machine withdrawals occurred with the use of Jade's ATM card.

At approximately 12:30 p.m. that same day, Woods ran into his brother-in-law, Louis Thompson, at a grocery store in the downtown area. Thompson gave Woods a ride to the home of Woods's friend, Johnny Knight. Knight and his friend, Mary Knapp, testified that when Woods came to their home, he offered to sell them some jewelry and to buy one of Knight's automobiles.

Woods spent the night at Elizabeth Gerber's apartment. The following morning, Gerber asked Woods to leave the apartment. At trial, she testified that Woods became agitated and said he was "a wanted man" and she was "putting him on the streets."

Later that day, Knight heard a television broadcast that authorities were searching for Woods. In response, Knight called the police and agreed to lead them to Woods. With Knight's cooperation, sheriff's deputies followed Knight as he went to pick up Woods. After Knight picked Woods up, the deputies pulled the car over. Knight got out, but Woods jumped into the driver's seat and sped away. The deputies eventually caught, arrested, and interrogated him.

Woods told the interviewing detectives that he fled because he had a number of "outstanding traffic violations" and some "traffic warrants." At the time of his arrest, Woods had no outstanding traffic violations. Woods denied any responsibility for the crimes and claimed he had not been in contact with Venus for about a week. He further denied knowing a woman named Jade. He also told detectives that he had not been in Spokane Valley for about a month, that he had never visited a trailer home, and that there was no logical explanation of why his fingerprints would have been found in the trailer.

## II.  PRE-TRIAL PROCEEDINGS

Woods was charged with two counts of aggravated first degree murder, one count of attempted first degree murder, and in the alternative, one count of first degree assault.[4] At his arraignment on May 30, 1996, Woods pleaded not guilty to the charges and waived his right to be tried within sixty days of his arraignment, but not later than November 12, 1996. The trial was set for October 21, 1996.

---

[4] The State later amended the information to include a charge of eluding police.

In the meantime, the prosecution processed the physical evidence in the case. Doctors had completed "rape kits" for all three victims, including taking a swab from the vagina of each victim. The rape kits were sent to the Washington State Patrol Crime Laboratory (or "WSPCL") in Spokane. At the Spokane lab, William Morig examined the swabs in search of sperm cells that might contain the DNA of the murder suspect. Morig found no sperm on the swab taken from Venus Shaver, but found usable samples from the swabs taken from Telisha Shaver and Jade Moore. The prosecution also obtained a vial of Woods's blood to use in DNA tests. That sample was sent to the Spokane lab as well. The WSPCL in Spokane did not have the required DNA testing equipment, so Morig's responsibilities were limited to preparing DNA samples from the rape kits and Woods's blood that could be submitted to other labs for DNA testing and analysis.

On August 23, 1996, Woods's defense counsel moved for a continuance of the trial date based on the fact that they had not received the DNA test results and that they needed additional time to produce mitigation evidence. Although Woods objected to this motion, defense counsel argued that unless a continuance was granted, Woods would be unable to receive a fair trial. The trial court ultimately granted the motion and reset the trial date for March 17, 1997.

On October 16, 1996, the prosecutor informed the court that the DNA evidence had not yet been sent for testing. The prosecutor represented that the results from the testing would be received by January 1, 1997. Consequently, the court ordered that the DNA test results be disclosed to the defense by January 1, 1997. The prosecutor also informed the court that the vial of Woods's blood had been mistakenly frozen

and had cracked. The prosecution therefore needed a new blood sample for testing purposes. Woods objected to providing a new sample and renewed his objection to having the trial commence after the original date of October 21, 1996. The court overruled both objections.

By January 2, 1997, the WSPCL had returned only one of two DNA test results. That test, performed by a private company, showed that Woods was not the source of semen found in Telisha's body. At a hearing on January 13, 1997, the prosecutor informed the trial court that the testing of the sperm sample taken from Jade Moore was not complete. WSPCL performed that testing at its more advanced Seattle laboratory because it required a complex testing procedure. The prosecutor informed the court that the test would not be complete until the middle of February 1997. Defense counsel moved to exclude admission of the DNA evidence as a result of the delay, to dismiss the case because of prosecutorial mismanagement, and to continue the case in order to have time to adequately prepare for trial in light of the delay in DNA testing. The trial court denied the first two motions but granted the last and continued the trial to May 19, 1997. Before trial, WSPCL returned the results of the DNA testing performed in Seattle, which showed that the DNA taken from Woods's second blood sample matched the DNA taken from the sperm recovered from Jade Moore.

## III. GUILT PHASE PROCEEDINGS

At trial, Venus and Sherry Shaver identified Woods as the assailant. The jury also heard Jade's statements, including her identification of Woods, via the testimony of a paramedic, nurse, and doctor who treated Jade and the testimony of her father, Barry Moore, who spoke to Jade after the attack. Dr.

John Brown, a forensic scientist at WSPCL's Seattle laboratory, testified that the sperm recovered from Jade contained Woods's DNA. A fingerprint expert testified that Woods's fingerprints were on a bottle and a telephone found in the trailer. The jury also learned that Woods's coat and shirt were found at the trailer and saw paging and telephone records demonstrating that Woods's pager had been called from the trailer several times during the early hours of April 27, 1996.

The defense theory was that Woods could not have murdered Telisha and Jade or assaulted Venus because he was dining at a bar in downtown Spokane at the time the crimes occurred. To support this alibi defense, the defense presented testimony from an expert on eyewitness misidentification and from a bartender who testified that he saw Woods at a downtown bar on the evening in question.

The jury found Woods guilty of two counts of aggravated murder, one count of attempted murder, and one count of attempting to elude police officers.

## IV.  PENALTY PHASE PROCEEDINGS

Woods instructed his attorneys not to present any mitigating evidence at the penalty phase of the trial. Concerned about Woods's mental state, defense counsel requested a continuance of the penalty phase in order to have Woods's mental capacity assessed. The trial court denied the motion and ordered the trial to commence that afternoon. The prosecution offered the testimony of Sherry Shaver and Barry Moore, presented photographs of Telisha and Jade, and entered into evidence certified judgments of Woods's prior convictions.

Pursuant to Woods's instructions, defense counsel did not present any mitigating evidence. Woods did, however, invoke his right to allocution and made the following statement to the jury:

> Well, ladies and gentlemen, you heard from [the prosecutor] and so you know that he's asking that you impose the death penalty. I just want to say that I have no objection. Also, I just want to remind you that a few weeks back during individual voir dire each of you was asked if you could, in fact, impose the death penalty. I believe at that time each of you said you could impose the death penalty providing there's not sufficient mitigating circumstances.
>
> So I am here to tell you there's absolutely none, not one. So I ask that each of you go back and return a vote to impose the death penalty. Thank you.

After deliberating for two days, the jury found that there were insufficient mitigating circumstances to merit leniency. Woods was sentenced to death.

## V. STATE AND FEDERAL POST-CONVICTION PROCEEDINGS

The Washington Supreme Court affirmed the convictions and sentence on direct appeal. *See Woods*, 23 P.3d at 1079. The Supreme Court denied certiorari. *See Woods v. Washington*, 534 U.S. 964 (2001). Woods then filed a personal restraint petition ("PRP") in the Washington

Supreme Court.  Woods raised eighteen claims for relief, including an ineffective assistance of counsel ("IAC") claim, a *Brady* claim, a claim that the jury had been improperly prohibited from viewing certain evidence, and a claim that newly discovered evidence required a new trial.  The Washington Supreme Court denied Woods's petition. *See In re Woods*, 114 P.3d at 611.

Woods next filed a federal habeas petition.  The State's answer raised a number of procedural-bar defenses, including a claim that Woods had not properly exhausted his claims. The district court bifurcated the briefing to first determine whether any of Woods's claims were procedurally barred. On the basis of this first round of briefing, the district court concluded that some portions of Woods's IAC claims and *Brady* claims were procedurally barred.  The court then considered Woods's remaining claims on the merits, and ultimately dismissed the petition in its entirety.

Woods filed a timely notice of appeal and moved for a COA on all of his claims.  The district court granted a limited COA, the scope of which we address below.

## VI.  STANDARD OF REVIEW

We review de novo a district court's denial of a prisoner's petition for habeas relief.  *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007).  The district court's findings of fact are reviewed for clear error. *Id.*

Because Woods filed his federal habeas petition after 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this action. *See id.*  The AEDPA requires federal courts to defer to the last reasoned state court

decision. *Id.* A federal court may grant a state prisoner's habeas petition with respect to a claim that was "adjudicated on the merits in State court proceedings" only if the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or if it "either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, our "review . . . is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). We consider circuit precedent for the limited purpose of assessing what constitutes "clearly established"

Supreme Court law and whether the state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

## VII. SELF-REPRESENTATION

Woods contends that he made an unequivocal request to represent himself and that the trial court was thus obliged under *Faretta v. California*, 422 U.S. 806 (1975), to conduct a colloquy to determine whether his request was voluntary, knowing, and intelligent. The court's failure to do so, Woods argues, violated his Sixth Amendment right to self-representation. On direct appeal, the Washington State Supreme Court concluded that Woods had failed to make an unequivocal request. *See Woods*, 23 P.3d at 1061–62. The district court agreed, and we affirm.

Under *Faretta*, a criminal defendant may invoke the right of self-representation by making an unequivocal request, and knowingly and intelligently waiving the right to counsel. *Faretta*, 422 U.S. at 835. Here, during pre-trial proceedings, Woods twice informed the court that he opposed any continuance of the trial date. First, on August 16, 1996, Woods informed the court that he opposed any extension of time for the prosecution to file its notice of special sentencing proceeding[5] or any further continuance of his trial date. On

---

[5] Under Washington law, when a criminal defendant is eligible for the death penalty, the State is required to file a notice of special sentencing proceeding within thirty days after the defendant's arraignment. Wash. Rev. Code § 10.95.040(2). If that notice is not timely filed, the State may not seek the death penalty. *Id.* § 10.95.040(3). On direct appeal, Woods argued that the State had failed to comply with this requirement, and that he was therefore entitled to a new trial. *See Woods*, 23 P.3d at 1062–63.

August 23, 1996, Woods again expressed his opposition to any further continuance when his defense counsel requested that the trial date be pushed back to May 5, 1997, as a result of the delay in processing the DNA evidence. The following colloquy then took place:

> [DEFENSE COUNSEL]: I think the only effective date we can ask for right now is the 5th of May of '97.
>
> WOODS: Your Honor, you know, I will be—I will be prepared to proceed with—with this matter here without counsel come October 21st.
>
> THE COURT: All right. You understand you have the right to do that.
>
> WOODS: Yes.
>
> THE COURT: Counsel, have you discussed this with your client?
>
> [DEFENSE COUNSEL]: No. We have not discussed that point at all. It's a surprise to me.

---

The Washington Supreme Court rejected that argument, among others, in a 5-1 opinion. *Id.* at 1063. Justice Sanders's dissent, however, concluded that the State had indeed erred and that such error required the court to vacate Woods's death sentence. *Id.* at 1079–81 (Sanders, J., dissenting). Woods did not raise this state law issue in his federal habeas petition.

> WOODS: I've—I've already consented to one continuance, Your Honor. And they—they have done nothing but grossly misuse that time there. And I feel if—if they was granted a second continuance, it—it would be treated in the same manner, Your Honor.
>
> THE COURT: All right. Thank you.

Shortly afterward, the prosecutor stated that "the defendant is indicating he wants to proceed pro se." The trial judge replied: "He didn't indicate that. He indicated he was able to do that." Nobody made any further references to Woods's request to proceed pro se throughout the remainder of the hearing.

On August 29, 1996, one of Woods's attorneys acknowledged in a written submission to the court that he was aware of Woods's desire for a "prompt resolution" of the case. On August 30, 1996, Woods's defense team renewed their request for a continuance. At a hearing on the motion, the judge stated: "I've heard Mr. Woods's point of view and I take it, it is unchanged. Is that correct?" Woods responded, "Yeah." The trial judge nonetheless granted the motion to continue the trial to March 17, 1997.

In concluding that Woods's request was equivocal, the Washington State Supreme Court analogized his request to that made by the defendant in *State v. Luvene*, 903 P.2d 960 (Wash. 1995). There, frustrated by his attorney's request for a continuance, the defendant addressed the court directly and stated:

I've been here since July . . . . You know, I don't wanna sit here any longer. It's me that has to deal with this. If I'm prepared to go for myself, then that's me. You know, can't nobody tell me what I wanna do. They say I did this, so why not—if I wanna go to trial, why can't I go to trial on the date they have set for my life? I'm prepared. I'm not even prepared about that. I wanna go to trial, sir . . . .

I don't wanna extend my time. This is out of my league for doing that. I do not want to go. If he's not ready to represent me, then forget that. But I want to go to trial on this date.

*Id*. at 966. In *Luvene*, the Washington Supreme Court concluded that these statements, taken in the context of the record as a whole, could be seen only as an "expression of frustration by [the defendant] with the delay in going to trial and not as an unequivocal assertion of his right to self-representation." *Id.*

Noting the similarities between the statements in *Luvene* and Woods's statement, the Washington State Supreme Court held:

Woods's statement cannot be viewed as an unequivocal statement of his desire to proceed to trial pro se. His statement, like that which we examined in *Luvene*, merely revealed the defendant's displeasure with his counsels' request to continue the trial for a lengthy period of time. Woods, like the defendant in

> *Luvene*, was undoubtedly frustrated by the delay, and his statement to the trial court appears to have been an expression of those feelings.
>
> . . .
>
> We are satisfied that telling a trial judge he "will be prepared to proceed without counsel" is qualitatively different than telling a judge that one wishes to proceed pro se. Woods's comment was in the former category and was not an expression of an unequivocal desire to represent himself. We conclude, therefore, that he was not denied his constitutional right to proceed pro se and is not entitled to a new trial on that basis.

*Woods*, 23 P.3d at 1062.

We conclude that the Washington Supreme Court's determination that Woods's pre-trial statement, as quoted above, was "not an expression of an unequivocal desire to represent himself," *id.*, was not "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2). *Cf. United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) (expressly considering as a question of fact whether a defendant made an unequivocal *Faretta* request). Although it is not apparent what factual basis the Washington Supreme Court relied on to conclude that Woods was merely expressing "frustration," we cannot say, in light of the state trial court record, that the court's holding was unreasonable. Shortly after Woods stated that he was prepared to proceed without counsel, the trial court expressly disagreed with the

prosecutor's statement that Woods was asking to proceed pro se, stating that "[Woods] didn't indicate that [he wanted to proceed pro se].  He indicated he was able to do that." Woods had the opportunity to correct or clarify the court's understanding if it was incorrect.  Yet neither Woods nor his counsel reasserted the request to proceed pro se again during the hearing or any future hearings.[6]  In light of this exchange, we cannot conclude that the state court's factual determination was unreasonable.  Woods is therefore not entitled to relief under this claim.

## VIII.  CONFRONTATION CLAUSE

Woods next argues that admission of Jade Moore's out-of-court statements at trial violated his rights under the Confrontation Clause.  The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  Under *Ohio v. Roberts*, controlling law at the time of Woods's conviction, admission of an out-of-court statement at trial did not violate the Confrontation Clause if the statement possessed "adequate indicia of reliability."  448 U.S. 56, 65–66 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).[7]  A statement

---

[6] Woods claims that at the next hearing he reasserted his right to proceed pro se.  At that hearing, in discussing whether or not to grant a continuance, the trial court stated, "I've heard Mr. Woods' point of view and I take it, it is unchanged.  Is that correct?"  Woods replied, "Yeah." We cannot reasonably discern from Woods's reply a request to proceed pro se.

[7] Woods's conviction became final before the Supreme Court issued its opinion in *Crawford*, so we apply the clearly established pre-*Crawford* Supreme Court law.  *See Whorton v. Bockting*, 549 U.S. 406, 421 (2007)

is sufficiently reliable if it falls "within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Id.* at 66. The Supreme Court subsequently recognized that "spontaneous declarations"—the same types of statements referred to as "excited utterances" under Washington's hearsay laws—constitute a "firmly rooted" hearsay exception. *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992). Likewise, the Court recognized that statements made to physicians in the course of diagnosis also fall within a "firmly rooted" exception. *Id.*

Here, over Woods's objection, the trial court allowed five witnesses to testify about statements that Jade made after the attack and before her death. Deputy Douglas Lawson of the Spokane County Sheriff's Department, who responded to the scene of the crime, testified at trial that he asked Jade whether she knew who attacked her and that she responded it was "a guy named Dwayne." Carol Ragland-Stone, a paramedic who accompanied Jade to the hospital, testified at trial that: (1) when she asked Jade what had happened to her, Jade told her that she had been hit with a baseball bat; (2) when she asked Jade who hit her, Jade responded that it was a man named Dwayne; and (3) when asked whether she was sexually assaulted, Jade said yes. Jade's father, Barry Moore, testified that when he went to visit Jade in the emergency room, she gave him a detailed account of the incident. Barry Moore repeated this account to the jury. Dr. Edminster, who was working at the hospital where Jade was admitted, testified that he asked Jade a number of questions as part of a routine rape examination procedure. Dr. Edminster gave

(holding that the new *Crawford* rule is applicable only to cases that are still on direct review and does not apply retroactively to cases on collateral review).

detailed testimony about Jade's answers to these questions. Finally, Dianne Bethel, a registered nurse who assisted Dr. Edminster in the administration of the rape examination, also testified as to Jade's answers to the rape examination questions.

To determine whether Woods's Confrontation Clause rights were violated, we must resolve whether Jade's statements to these witnesses fell within either the "firmly rooted" excited utterance or medical diagnosis exceptions to the hearsay rule. We address the five witnesses's statements in turn.

First, Woods argues that some of Jade's statements to Dr. Edminster and nurse Bethel were not elicited for purposes of diagnosis and treatment and therefore do not fall within the medical diagnosis exception to the hearsay rule. Under *White*, in order for a statement to fall within the medical diagnosis exception, it must have been "made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment." *Id.* at 356.

The Washington Supreme Court held that Jade Moore's statements to Dr. Edminster and Bethel were admissible under this exception because they were pertinent to later treatment for post traumatic stress disorder. Because this conclusion is at least plausible and because the Supreme Court has yet to address whether such statements relevant only to later psychological treatment fall within the medical diagnosis exception to the hearsay rule, we cannot conclude that the Washington Supreme Court's determination was clearly unreasonable.

Woods next argues that Jade's statements to Barry Moore and to paramedic Ragland-Stone should not have been admitted into evidence under the excited utterance exception. In *White*, the Court explained that statements that have "been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation" fall within the excited utterance exception. *Id*. If, on the other hand, a statement is made after the declarant has had an opportunity to reflect or discuss the matter with others, it no longer qualifies for the excited utterance exception. *Winzer v. Hall*, 494 F.3d 1192, 1198 (9th Cir. 2007) (interpreting *White*).

According to the Washington Supreme Court, "it was not manifestly unreasonable for the trial court to admit Jade's statements to Ragland-Stone and her father as excited utterances." *Woods*, 23 P.3d at 1069. As to Jade's statements to Ragland-Stone, the court noted:

> [T]he record reflects that the statements to Ragland-Stone were made, in a spontaneous manner, on the heels of a clearly startling event. . . . Also, it is clear that when Jade was making the statements to Ragland-Stone, Jade was under the stress caused by the underlying assault. According to Ragland-Stone, when Jade was first moved into the ambulance, Ragland-Stone said she was "whimpering, like crying almost" and was "very emotional, very distraught, clearly upset and in a lot of pain."

*Id.* at 1068. We must accept the state court's factual findings unless objectively unreasonable. 28 U.S.C. § 2254(d)(2);

*Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). Because there was no evidence to the contrary, the state court's conclusion that the statements were made "in a spontaneous manner, on the heels of a clearly startling event," was not objectively unreasonable. *Woods*, 23 P.3d at 1068. Given those circumstances, Jade's statements to Ragland-Stone met the *White* requirement for an excited utterance: they were offered "in a moment of excitement—without the opportunity to reflect on the consequences of [her] exclamation." *White*, 502 U.S. at 356. The state court's conclusion was therefore not objectively unreasonable. For the same reasons, we conclude that the state court was not objectively unreasonable in holding that Jade's statements to Deputy Lawson fell within *White*'s requirements.

Jade's statements to Barry Moore, however, do not fall within the excited utterance exception as formulated by *White* because they were not made before Jade had an opportunity to reflect. Rather, these statements were made after Jade had already been transported to the hospital and after she had already recounted the events to Ragland-Stone, Edminster and Bethel. Furthermore, in recounting the events to her father, Jade said that she had gone to bed early despite the fact that she had been up until past 3 a.m., and she also failed to recount that she had been drinking prior to the attack or that she had sought to buy drugs from Woods. *Woods*, 23 P.3d at 1068. Those misrepresentations suggest that Jade had the opportunity to reflect on the consequences of her statements. Furthermore, unlike its findings about Jade's statements to Ragland-Moore, the Washington Supreme Court's opinion contains no similar findings as to the spontaneity of Jade's statements to Barry Moore. We therefore conclude that the state court's determination that Jade's statements to her father were "excited utterances" was

an unreasonable application of *White*, clearly established federal law. Accordingly, admission of Jade's statements to Barry Moore constituted a violation of Woods's rights under the Confrontation Clause.

Violation of the Confrontation Clause, however, is subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). If the error did not result in "actual prejudice," Woods is not entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Here, Jade's statements to her father were, for the most part, cumulative of the statements she gave to Edminster, Bethel and Ragland-Stone. Jade's prior statements all included the details of the crime and identification of Woods as the perpetrator. Furthermore, Jade's prior statements were cumulative of the testimony by Venus, who also identified Woods as the attacker. Thus, Woods cannot establish prejudice as a result of the Confrontation Clause violation, and he is not entitled to habeas relief on this issue.

## IX.  DUE PROCESS CLAIM — WITHHOLDING MATERIAL EVIDENCE

Woods argues that the prosecution withheld material, exculpatory evidence in violation of *Brady v. Maryland*. Specifically, Woods argues in two *Brady* sub-claims[8] that the prosecution withheld evidence concerning: (1) WSPCL's general policy of destroying "draft" reports, as evidenced by Dr. John Brown's conduct in *State v. Barfield*, No. 48147-9-I, 2003 WL 22121058 (Wash. Ct. App. Sept. 15, 2003), and (2)

---

[8] The first sub-claim is set out in claim 5.1 in Woods's federal habeas petition. The second sub-claim is set out in claim 5.2 in Woods's federal habeas petition.

the full details of how the WSPCL mishandled the physical evidence in his case, including spillage of Woods's first blood sample. On the first *Brady* sub-claim, the district court denied Woods's request for an evidentiary hearing and denied habeas relief. The district court ruled that the second sub-claim was procedurally defaulted. We address each sub-claim in turn.

## A. The State's failure to disclose WSPCL's general practices

Woods argues that the prosecution had knowledge of WSPCL's DNA testing and review protocol, which included discarding "draft" reports, and was therefore required under *Brady* to disclose the lab's review process. Woods bases this contention on Dr. Brown's conduct detailed in *State v. Barfield*, 2003 WL 22121058.[9] In *Barfield*, Dr. Brown tested the DNA from a semen sample retrieved from a rape victim and compared the results to a WSPCL database that included defendant Barfield's DNA. *Id.* at *1. He did not identify a match, and created a draft report reflecting that result. *Id.* Brown's supervisor, Donald MacLaren, independently analyzed the test results and, after reviewing Brown's draft report, noticed that Brown had made an error. *Id.* After MacLaren brought the error to his attention, Brown discarded the erroneous draft report and prepared a new report reflecting the correct analysis, which indicated the DNA from the semen sample matched Barfield's DNA profile in the WSPCL database. *Id.* In a pretrial interview with defense counsel, Brown initially denied excluding Barfield in an earlier report, but later admitted that he had performed the

---

[9] Dr. Brown analyzed DNA in the *Barfield* case in 1997, but after he analyzed the DNA evidence and testified in Woods's case.

first round of analysis incorrectly and had discarded the initial erroneous draft report. *Id*. Dr. Brown testified at Barfield's rape trial that he had lied to defense counsel because he was embarrassed about making an obvious error. *Id*. at *2.

In a declaration submitted to the Washington Supreme Court in Woods's PRP proceeding, MacLaren, who also reviewed Dr. Brown's analysis in Woods's case, stated that the review process followed in *Barfield*—including peer review and discarding erroneous draft reports—was standard procedure at WSPCL. MacLaren declared, however, that "out of the thousands of autorads this lab has developed there have been less than ten instances where a resizing was necessitated by the review process."

Woods argues that had he known about WSPCL's practices at the time of trial, he would have used the information to impeach Dr. Brown and to challenge the prosecution's DNA evidence by questioning the quality of WSPCL's internal review process. Woods contends that Dr. Brown's misconduct in the *Barfield* case revealed a longstanding practice of hiding the results of exculpatory tests and that there were indicia in this case that draft reports may have been destroyed. Specifically, Woods points out that WSPCL assured the prosecution that testing would be completed by January 1, 1997, but it was not completed until February 20, 1997. Woods argues that it is reasonable to infer that the delay was due to one or more tests that were never reported to the defense.

To prevail on a *Brady* claim, a defendant must prove that "[1] The evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence [was] suppressed by the State, either willfully or

inadvertently; and [3] prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see Brady*, 373 U.S. at 87. To establish prejudice, a defendant must demonstrate that "there is a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Strickler*, 527 U.S. at 289 (internal quotation marks omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The duty imposed by *Brady* extends to evidence in the government's possession not known to the prosecutor, but applies only to "favorable evidence rising to a material level of importance." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Moreover, the prosecutor's duty to disclose under *Brady* is limited to evidence a reasonable prosecutor would perceive at the time as being material and favorable to the defense. *Id.* at 436–37.

The state supreme court concluded that WSPCL's general practice of peer review and destruction of erroneous draft reports was not exculpatory material in Woods's case, and that the prosecution did not have a duty to disclose the lab's general practices and procedures. This conclusion was not contrary to nor an unreasonable application of *Brady* under 28 U.S.C. § 2254(d)(1). The bare fact that the lab subjected DNA test results to peer review and discarded draft reports when peer review turned up an error does not tend to show that an error occurred in Woods's case. We recognize that destruction of a draft report that excluded a defendant as a match with a suspect's DNA would likely violate *Brady* in light of the report's impeachment value. Although WSPCL may have followed such a practice in those rare instances

when its peer review process revealed an erroneous analysis, there is nothing to suggest that the state suppressed an erroneous draft report in Woods's case.  Moreover, Dr. Brown's misconduct in *Barfield* occurred months after Woods's trial concluded, so the prosecution did not possess any information about Brown's actions in *Barfield* that could have impeached him at Woods's trial.

Even if evidence of WSPCL's general practices were not exculpatory, Woods argues that it would be reasonable to infer from Dr. Brown's conduct in *Barfield* and the delay in obtaining DNA test results in his case that WSPCL conducted tests in his case that were never reported to the defense. Woods contends the state supreme court wrongfully denied him an evidentiary hearing to develop this claim.  We construe his argument as a claim that the state court's factfinding process was flawed and was therefore an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  A state court's fact-finding process is unreasonable under § 2254(d)(2) only when we are "satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's factfinding process was adequate."  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

Here, there was no defect in the state supreme court's factfinding process.  Although it might have been prudent to provide Woods with the opportunity to develop the facts underlying this aspect of his *Brady* claim, the state court's decision to deny him a hearing was based on its consideration of the declarations of Dr. Brown and MacClaren that were filed with the Washington Supreme Court.  Although neither declaration expressly denied the existence of an erroneous draft report in Woods's case, there is nothing in those

declarations or anywhere else in the record to suggest that such a report existed. It was not unreasonable for the Washington Supreme Court to deny Woods's request for a hearing when all he could offer was speculation that an evidentiary hearing might produce testimony or other evidence inconsistent with Dr. Brown and MacClaren's declarations.

We further conclude that the Washington Supreme Court did not make an unreasonable determination of the facts under § 2254(d)(2) when it found that there was no showing Dr. Brown destroyed evidence in this case.   The only evidence before the state court was that MacClaren reviewed Dr. Brown's test results and agreed with them.   We agree with the Washington Supreme Court that "the record does not show that Dr. Brown intentionally destroyed exculpatory evidence and then lied about it."   *In re Woods*, 114 P.3d at 622.

Because the state supreme court's ruling was neither an unreasonable application of federal law nor an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(1)–(2), we affirm the district court's denial of relief on this sub-claim.[10]

---

[10] Woods also requested an evidentiary hearing in the district court to develop his claim.   Because our review of a claim adjudicated on the merits by the state court under 28 U.S.C. § 2254(d)(1) is limited to the record before the state court under *Pinholster*, 131 S. Ct. at 1398, we see no need to afford Woods an opportunity to develop evidence in support of his argument that the state supreme court unreasonably applied *Brady*.   To the extent that Woods attacks the state court's factfinding, we have held that where there is no defect in the state court's factfinding process, as here, "the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on . . . evidence presented for the first time in federal court."   *See Taylor*, 366

## B.  Failure to disclose details of the spillage of Woods's first blood sample

Woods alleges that the State failed to disclose the full details of the spillage of his first blood sample at WSPCL's laboratory in Spokane.  Woods claims that this evidence would have shown that there was a significant risk that the rape kit swab taken from Jade Moore was contaminated when Woods's blood sample leaked, thus leading to a false positive DNA match.  The district court found that Woods did not fairly present this sub-claim to the Washington Supreme Court and ruled that the sub-claim was procedurally barred. We agree.[11]

_____

F.3d at 1000.  Woods alleges no facts to support his claim beyond the suspicion that the prosecution's delay in obtaining and reporting DNA test results indicates the destruction and non-disclosure of exculpatory evidence.  "Bare allegation[s]," "speculation," and "wishful suggestions" do not entitle a petitioner to an evidentiary hearing. *Morris v. California*, 966 F.2d 448, 455–56 (9th Cir. 1991).  We therefore affirm the district court's denial of an evidentiary hearing.

[11] Woods and the State disagree as to whether the COA includes the earlier procedural rulings related to each claim or, rather, is limited only to the claims as considered by the court in its final order. Woods argues that the district court's grant of a COA relates not only to the merits of the claims but also to the procedural rulings associated with each claim.  The State, on the other hand, argues that the COA does not cover the procedural rulings and therefore does not allow us to review whether Woods's second *Brady* sub-claim was properly exhausted.   In his Memorandum in Support of Motion for Certificate of Appealability filed with the district court, Woods expressly requested that the COA include the district court's procedural rulings.  *See Woods v. Sinclair*, No. CV-05-0319-LRS (E.D. Wash. Dec. 29, 2008).   In light of these circumstances and the minimal showing that is required for a COA to issue, *see Lopez v. Schriro*, 491 F.3d 1029, 1039 (9th Cir. 2007) (stating that appellant need only show that reasonable jurists would find the

State prisoners seeking a writ of habeas corpus from a federal court must first exhaust their remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A petitioner has exhausted his federal claims when he has fully and fairly presented them to the state courts. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999) ("Section 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims."). "[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *see also Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008). A claim that has not been fairly presented may also be deemed technically exhausted if the petitioner has defaulted on the claim in state court and no longer has a remedy in that court. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Although, due to the state court default, a federal court may be procedurally barred from reviewing such a claim. *Id.* at 750.

Here, Woods presented the state supreme court with both the operative facts and legal theory of his sub-claim that the State withheld evidence of WSPCL's general testing and review protocols, but he did not present facts relating to the breakage of the vial containing his first blood sample at the Spokane lab. Woods argues that, although his PRP never expressly raised a claim about the spillage of his blood sample and the potential for contamination of other evidence,

---

district court's assessment of the constitutional claims debatable or wrong), we agree with Woods that the COA should be construed to encompass related procedural rulings. Therefore, we conclude that the COA includes the question of whether Woods exhausted his second *Brady* sub-claim, and we proceed to consider it.

his state court *Brady* claim alleging the non-disclosure of WSPCL's practice of discarding erroneous draft reports was sufficient to raise the issue of the prosecution's failure to disclose the mishandling of *all* the evidence related to DNA testing. In his amended PRP, Woods unequivocally stated that his *Brady* claim related to how WSPCL's general practices related to his case. Woods noted in his PRP that "counsel moved to take depositions of Dr. Brown, William Morig, and Donald MacLaren, all of the Washington State Patrol Crime Lab, to determine *the specific practices in this case*." (emphasis added). Woods suggests this language was sufficient to put the state supreme court on notice of the second *Brady* sub-claim he raised in his federal habeas petition.

Nowhere in the PRP's *Brady* section, however, does Woods mention the spillage of the first blood sample. Aside from his request to depose Morig, Woods's only reference in the PRP to the forensic work at WSPCL's Spokane facility stated that Morig received the rape kit swabs, prepared samples from the swabs, and sent the samples to other laboratories to be tested. The *Brady* claim presented in the PRP focuses entirely on the actions of Dr. Brown, both in the *Barfield* case and in Woods's case. Yet Dr. Brown had nothing to do with the storage, spillage, and breakage of the vial containing Woods's first blood sample. In fact, Woods does not allege that Dr. Brown even knew that a spillage occurred. As discussed above, Dr. Brown's conduct in the *Barfield* case does not create a presumption that WSPCL, as an organization, systematically suppressed exculpatory material. We thus fail to see how the *Brady* claim in Woods's PRP, which spoke only to Dr. Brown's procedures for testing and analysis in the Seattle lab, gave the state supreme court a full and fair opportunity to act on an

allegation that the prosecution withheld evidence related to the spillage of a blood sample at WSPCL's Spokane laboratory. Accordingly, we conclude that Woods failed to present the facts underlying his second *Brady* sub-claim to the Washington Supreme Court, and we affirm the district court's ruling that the sub-claim regarding the spillage of Woods's blood sample is technically exhausted but procedurally barred.

Woods contends that the district court nonetheless should have entertained his sub-claim because he established cause for the procedural default and prejudice resulting from his failure to exhaust state remedies. *See Banks v. Dretke*, 540 U.S. 668, 690–91 (2004) (holding that petitioner would be entitled to an evidentiary hearing in federal court if he could show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure). For a *Brady* claim, cause and prejudice "'parallel two of the three components of the alleged *Brady* violation itself.'" *Id.* at 691 (quoting *Strickler*, 527 U.S. at 282). A petitioner may establish cause by showing that the prosecution's suppression of evidence was the reason for the petitioner's failure to develop the factual basis of the claim in state court. *Id.* Prejudice is established by showing that the suppressed evidence is material for *Brady* purposes. *Id*. Here, Woods argues that he failed to develop the facts of this sub-claim because the State never disclosed the full details of the spillage of his first blood sample. We agree with the district court that this is insufficient to show that the prosecution's alleged suppression of evidence caused Woods's failure to develop his sub-claim in state court.

Notably, the prosecution disclosed before trial that the vial containing Woods's first blood sample had cracked and

leaked at the Spokane lab. That disclosure put Woods on notice that other evidence may have been contaminated. Woods does not allege what further exculpatory facts the prosecution possessed but failed to disclose. Moreover, although Woods sought authorization from the Washington Supreme Court to conduct certain discovery, neither his discovery requests nor his request for an evidentiary hearing specifically related to the spillage of the blood sample or the possible contamination of other evidence. His failure to develop the factual basis of his claim, therefore, cannot properly be attributable to the prosecution's failure to disclose relevant evidence. We thus affirm the district court's dismissal of this sub-claim as procedurally defaulted.[12]

---

[12] Woods also seeks an evidentiary hearing on the merits of this sub-claim and on the issue of cause and prejudice as an excuse for his procedural default. Under the AEDPA, 28 U.S.C. § 2254(e)(2):

> [i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> > (A) the claim relies on-
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no

## X.  INEFFECTIVE ASSISTANCE OF COUNSEL

Woods argues that he was denied his Sixth Amendment right to effective assistance of counsel on the basis of a number of deficiencies in his defense team's performance. The district court concluded that seven of these IAC sub-claims had been properly exhausted before the state courts and therefore considered them on the merits: (1) counsel's heavy workload; (2) counsel's lack of experience and training; (3) counsel's failure to properly impeach witness Johnny Knight; (4) counsel's failure to investigate and present Woods's diminished capacity defense; (5) counsel's failure to investigate and present Woods's voluntary intoxication defense; (6) counsel's failure to ensure that the DNA autoradiograms went into the jury deliberation room; and (7) counsel's failure to object to the use of Woods's alias, "Michael A. Smith," during the trial.

The district court also concluded that a number of the IAC sub-claims were procedurally barred, including: (1) counsel's failure to address Venus's recovered memories; (2) counsel's failure to adequately cross-examine Venus on her prior false

---

reasonable factfinder would have found the applicant guilty of the underlying offense. Woods cannot meet this high standard. Woods fails to allege what facts relevant to his *Brady* claim or to the issue of cause and prejudice will be uncovered by an evidentiary hearing aside from the suspicion that the prosecution might have been hiding information relating to DNA contamination. We agree with the district court that these speculative allegations do not meet the required showing under § 2254(e)(2), and we affirm the district court's denial of an evidentiary hearing.

allegation that Woods had raped her; (3) counsel's failure to call a DNA expert to contest the DNA evidence; and (4) counsel's failure to investigate adequately the potential DNA contamination caused by the broken vial of Woods's blood.

Both parties agree that the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), constitutes "clearly established federal law" providing the proper framework for assessing Woods's IAC claims. Under the AEDPA, the primary issue is whether the state court adjudication of the *Strickland* claims was objectively reasonable. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). To prevail on an IAC claim under *Strickland*, a petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. In evaluating IAC claims, "our cases require that . . . [we] use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Pinholster*, 131 S. Ct. at 1403).

As to the first prong, a petitioner must prove that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The Supreme Court has instructed lower courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. As to the second prong, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694. Finally, even if Woods can satisfy both of those prongs, the AEDPA requires

that a federal court find the state court's contrary conclusions are objectively unreasonable before granting habeas relief. *See Landrigan*, 550 U.S. at 473.

We first review those claims that the district court addressed on the merits, and then consider those the district court concluded were technically exhausted but procedurally barred.

## A.  Counsel's inexperience and caseload

Woods argues that, because his two primary defense attorneys faced unmanageable caseloads and were inexperienced in capital litigation, their performance was deficient.  The district court rejected that argument, and so do we.

Woods points out several troubling aspects of his counsel's experience and caseload.  For example, neither of Woods's attorneys had ever tried a capital case before.  One of Woods's attorneys was the lead attorney on four other murder cases during the time he was representing Woods, while the other was responsible for three other aggravated murder cases.  In fact, just weeks before trial, Woods's defense attorney requested an extended continuance, explaining that he had never prepared for a case of this magnitude before and that he did not feel comfortable beginning the trial.  The court denied this request.  Despite these alleged deficiencies, these circumstances do not, in and of themselves, amount to a *Strickland* violation.  Rather, Woods must point to specific acts or omissions that may have resulted from counsel's inexperience and other professional obligations.  *See Strickland*, 466 U.S. at 690.  Thus, Woods is not entitled to relief on this sub-claim alone.

## B. Diminished capacity defense

Woods claims that his attorneys should have investigated and pursued a diminished capacity defense. The state supreme court concluded:

> [I]t was reasonable for [Woods's] counsel to pursue the alibi defense rather than diminished capacity because Woods continuously denied his involvement in the crimes. To pursue the diminished capacity defense would have required Woods to essentially admit that he committed the murders, a position entirely inconsistent with his contention that he did not commit the murders.

*In re Woods*, 114 P.3d at 618.

The district court agreed, adding that Woods's staunch insistence on his innocence made it reasonable for counsel to "cho[o]se to pursue a defense of alibi and mistaken identification rather than a defense of diminished capacity, the latter of which had a high probability of failure." Order Denying Petition, Supplement, and Revised Petition for a Writ of Habeas Corpus at 44, *Woods v. Sinclair*, No. 2:05-cv-00319-LRS (E.D. Wash. Feb. 5, 2009), ECF No. 185 [hereinafter Dist. Ct. Order]. The Washington Supreme Court and the district court also agreed that, even if counsel's performance had been deficient, the failure to present a diminished capacity defense was harmless in light of the strong evidence of Woods's premeditation. *See* Dist. Ct. Order, *supra* at 44–45; *In re Woods*, 114 P.3d at 618–19. Woods argues that the state court's determination on this

issue was objectively unreasonable and that he is entitled to an expansion of the record and an evidentiary hearing. We need not address whether Woods's counsel's performance was deficient because we conclude he cannot demonstrate prejudice and is therefore not entitled to habeas relief on this sub-claim.

To be entitled to habeas relief, Woods must demonstrate that the Washington Supreme Court unreasonably concluded that counsel's performance did not prejudice him. The Washington Supreme Court held that, "[e]ven if Woods' attorneys failed to investigate the diminished capacity defense, it is harmless error because there is strong evidence of premeditation by Woods." *Woods*, 114 P.3d at 618–19. Under the second prong of *Strickland*, to demonstrate prejudice, Woods must show that it is reasonably probable that the outcome of his trial would have been different had counsel conducted a reasonable investigation into his diminished capacity defense. 466 U.S. at 694. "A reasonable probability does not mean that we must determine that the jury more likely than not would have returned a verdict for something beside [sic] first degree murder, but only that [defendant] has shown 'a probability sufficient to undermine confidence in the outcome.'" *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 694). Thus, Woods must demonstrate that it was objectively unreasonable for the state court to conclude that his counsel's deficient performance did not affect, or otherwise undermine confidence in, the outcome of his trial.

Even assuming that Woods's counsel were constitutionally deficient in their performance, the state court's determination that this deficiency was not prejudicial was objectively reasonable. According to Woods, his counsel

should have conducted further investigation into a diminished capacity defense. Yet, as the state supreme court noted, even if counsel had unearthed significant evidence of Woods's diminished capacity, "[t]o pursue the diminished capacity defense would have required Woods to essentially admit that he committed the murders, a possibility entirely inconsistent with his contention that he did not commit the murders." *In re Woods*, 114 P.3d at 618. Woods failed to present the Washington Supreme Court with any evidence (or even a declaration) that he would have been willing to abandon his alibi defense if presented with an alternative diminished capacity defense. We thus cannot say that the state court's determination on this sub-claim was objectively unreasonable.

## C. Voluntary intoxication defense

Woods faults counsel for not adequately investigating and presenting a voluntary intoxication defense. Although related to a diminished capacity defense, voluntary intoxication constitutes a separate cognizable defense under Washington law. *See State v. Hackett*, 827 P.2d 1013, 1016 n.3 (Wash. Ct. App. 1992) (per curiam) (holding that the voluntary intoxication defense applies to intoxication by drugs as well as alcohol, and that a diminished capacity instruction was not broad enough to cover voluntary intoxication falling short of mental illness or disorder).

Although this type of alleged deficiency may prejudice a defendant, *see Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998) (finding prejudice where counsel completely failed to investigate his client's mental health despite abundant signs in the record that his client suffered from mental illness); *Jennings*, 290 F.3d at 1019 (finding prejudice where counsel

failed to investigate and present mental health defenses and noting that the jury deliberated for two full days despite overwhelming evidence against the defendant), here we are not convinced that the state court's determination to the contrary was objectively unreasonable. Woods failed to submit any evidence that, had his defense counsel presented him with the option to pursue this defense, he would have agreed to it. In fact, the evidence before the state trial court demonstrated that Woods was insistent upon his innocence and that, in all probability, he would have rejected any defense requiring him to admit guilt. In sum, whether or not Woods's counsel's performance was constitutionally deficient, the Washington Supreme Court's determination that this failure did not prejudice Woods was not objectively unreasonable. Woods is therefore not entitled to relief on this sub-claim.

### D.  Cross-examination of witness Johnny Knight

Woods alleges that counsel did not properly cross-examine Johnny Knight about (1) his prior theft conviction and (2) his statements to police that increasingly incriminated Woods over time. We address those arguments in turn.

Johnny Knight, one of the State's key witnesses, falsely denied any prior theft conviction during direct and cross-examination. Woods argues that his counsel was constitutionally deficient in failing to impeach Knight's testimony with a copy of the theft conviction record. In rejecting this argument, the Washington Supreme Court held:

> [T]he failure to obtain the certified copy of judgment and conviction does not establish deficiency. We say that because questioning

> from the prosecution and defense established
> that all parties were aware that Knight had a
> theft conviction. In fact during questioning,
> Knight volunteered information about other
> convictions as well. Thus, it is clear that the
> jury was aware they were listening to a
> witness with multiple convictions. In effect,
> Knight impeached himself.

*In re Woods*, 114 P.3d at 619 (internal footnote omitted).
This characterization of the record is not quite accurate.
Rather, Knight denied having a theft conviction and, after
Woods's attorney objected, admitted that he had been
convicted of a "drug transaction." After a brief colloquy with
counsel, the trial judge stated in open court: "[Knight is]
subject to recall or you can just put in the evidence about the
conviction." Woods's counsel then moved on to other lines
of questioning without asking any further questions about the
theft conviction or introducing any evidence pertaining to it.

Whether or not the failure to introduce the certified copy
of Knight's prior judgment and conviction was deficient, we
are convinced that the state supreme court's determination
that Woods was not prejudiced by that failure was not
objectively unreasonable. The jury was indeed made aware
that Knight had been convicted of a crime. Woods argues
that Knight's admission of his drug conviction is irrelevant
because a conviction for a "drug transaction" is not
comparable to a theft conviction because drug crimes are not
crimes of dishonesty under Washington law. *See State v.
Hardy*, 946 P.2d 1175, 1178 (Wash. 1997). While we agree
that a drug conviction may not be as valuable for
impeachment purposes as a theft conviction, we cannot say
that the counsel's failure to elicit Knight's admission to a

theft conviction was sufficiently prejudicial to render the state supreme court's determination objectively unreasonable.

Nor is Woods entitled to relief on the basis of his counsel's failure to confront Knight with evidence that his statements to police changed significantly after he was charged with three felonies.  On April 28, 1996, the police questioned Knight and reported: "Johnny Knight denied having knowledge of the assaults or intention of any assaults that [Woods] may have been involved in."  On May 7, 1996, Knight was re-interviewed by the police and again said nothing about Woods confessing to the assaults.

On February 13, 1997, however, Knight was arrested for drug and firearm crimes for which he could face significant prison time.  A week later, police interviewed Knight in jail, and he alleged for the first time that on the day after the murders, Woods confessed that he had killed the women.  During this interview, Knight also told police that when he met up with Woods after the murders, Woods had women's jewelry, cash, and some credit cards which had been taken from the victims.  Additionally, Knight claimed that Woods said he needed "to get out of Spokane."

By the time of Woods's trial, Knight had been convicted of several felonies stemming from his arrest and had been sentenced to 10 years in prison.  The jury at Woods's trial did not learn of Knight's conviction and sentence.  Woods argues that counsel's failure to make the jury aware of Knight's arrest as a possible reason for the change in Knight's story constituted a *Strickland* violation.

The Washington Supreme Court never addressed this sub-issue in its decision, nor did Woods's personal restraint

petition raise it.  Nonetheless, the district court concluded that this claim had been properly exhausted because the new factual allegations did not fundamentally alter the legal claim already considered by the state court.[13]  The district court thus considered this issue on the merits, as do we.  Irrespective of whether Woods's counsel was deficient in failing to raise Knight's arrest at trial, that failure did not prejudice Woods. Ample evidence was presented to the jury that Knight was an untrustworthy witness: he had admitted to a drug conviction and to receiving a reward for information leading to Woods, and defense counsel impeached Knight on the stand for having misrepresented the amount he received as a reward. Accordingly, there is not a "reasonable probability that . . . the result of the proceeding would have been different" had Knight been further impeached with his February 1997 arrest and related convictions.  *Strickland*, 466 U.S. at 694.  Thus, Woods is not entitled to habeas relief on this claim.

## E.  Woods's alias

Woods contends that his trial counsel's failure to object to the use of Woods's alias, "Michael A. Smith," was constitutionally deficient and prejudicial.  The Washington Supreme Court, however, determined that the use of the alias was proper under state law as "relevant and material to prove or disprove any of the issues in the case."  114 P.3d at 619 (citing *State v. Elmore*, 985 P.2d 289, 310 (Wash. 1999); *State v. Cartwright*, 456 P.2d 340, 342 (Wash. 1969)). Specifically, the Washington Supreme Court determined that,

---

[13] The district court denied Woods's request to introduce new evidence supporting this claim.  In his supplemental brief, Woods concedes that this ruling was correct in light of the Supreme Court's decision in *Pinholster*. 131 S. Ct. at 1398.

because the identity of the perpetrator was at issue, because Woods was booked at the jail under the name "Michael A. Smith," and because two of the fingerprints that were found at the crime scene were identified as belonging to "Michael Smith," the use of the alias was appropriate to identify Woods as the perpetrator. *Id.* That determination of state law is binding on this court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Thus, even assuming Woods's attorney was deficient for not objecting to the use of his alias, we cannot conclude that it was prejudicial; even had defense counsel made the objection, it would have been properly overruled. Woods is therefore not entitled to habeas relief on this claim.

### F. The State's DNA evidence

Woods argues that his trial counsel failed to effectively challenge the State's DNA evidence. Specifically, Woods alleges that his counsel were ineffective in the following three ways: (1) they failed to present a defense expert to interpret the results of the DNA tests; (2) they failed to explore the issue of DNA contamination; and (3) they failed to ensure that the jury could examine the autoradiograms ("autorads").

The district court did not reach the merits of claims (1) and (2) (collectively the "DNA–IAC" claims) because it concluded that these claims had not been presented to the Washington Supreme Court and were therefore technically exhausted, but procedurally defaulted. *See* Wash. Rev. Code § 10.73.090; *see also Coleman*, 501 U.S. at 732, 735 n.1.[14]

---

[14] As discussed above, the district court did not specify whether the COA encompassed procedural issues related to Woods's IAC claim or only those parts of the claim that the district court determined were exhausted and, therefore, considered on the merits in its final judgment.

With respect to issue (3) above, the court held that because the trial court correctly refused to send the autorads to the deliberation room for consideration, Woods could not prevail on his IAC claim related to the autorads. We consider first Woods's DNA–IAC claims and then address the merits of Woods's autorad claim.

## 1. DNA–IAC Claims

The State argues that the factual and legal allegations underlying Woods's DNA–IAC claims were never presented to the state supreme court, the state court never ruled on the claims, and the claims are now procedurally defaulted. Woods initially argued that he fairly presented these claims in state court and therefore the district court erred in concluding that these were procedurally defaulted. In his supplemental briefing, post-remand, Woods now concludes that these claims were procedurally defaulted. In our prior opinion, we did not resolve this issue. Instead, we concluded that even if these claims had been properly exhausted, Woods could not show that he was entitled to habeas relief. We now conclude that the claims were not fairly presented in the state court. It is undisputed that the first specific reference to defense counsel's failure to explore the possibility of DNA contamination and present the testimony of a defense DNA expert was in Woods's federal habeas petition. We therefore agree with the parties and the district court that these claims were procedurally defaulted.

---

As noted in footnote 11, we construe the COA to encompass both the specific enumerated claims and any related procedural issues. Therefore, we consider whether the DNA–IAC claims were properly exhausted in state court.

Woods argues, nonetheless, that even if these claims are procedurally defaulted, the default should be excused because it was due to ineffective representation by his state post-conviction counsel. In *Martinez*, the Supreme Court held that, in some circumstances, ineffective representation by post-conviction counsel may provide a basis for excusing a procedural default. 132 S. Ct. at 1320. "[T]o establish 'cause' to overcome procedural default under *Martinez*, a petitioner must show: (1) the underlying ineffective assistance of trial counsel claim is 'substantial'; (2) the petitioner was not represented or had ineffective counsel during the [post-conviction relief ("PCR")] proceeding; (3) the state PCR proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding." *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014) (citing *Trevino v. Thaler*, —— U.S. ——, 133 S. Ct. 1911, 1918 (2013)).

We begin by addressing the latter two *Martinez* requirements. Woods argues that these two requirements are satisfied because Woods's DNA-IAC claims were not raised on direct appeal and, as a practical matter, could not have been raised on direct appeal because they rely on extra-record evidence (e.g. a declaration from a DNA expert, Dr. Donald E. Riley) and Washington law does not permit consideration of "matters outside the trial record" on direct appeal. *State v. McFarland*, 127 Wash. 2d 322, 335, 899 P.2d 1251, 1257 (1995). In the State's supplemental brief addressing the significance of *Martinez*, the State essentially argued that the exception recognized in *Martinez* was limited to cases where state law *categorically* prohibits a defendant from raising IAC claims on direct appeal, and that *Martinez* does not apply where state law only prohibits a defendant from relying on

extra-record evidence to support IAC claims raised on direct appeal. We reject this argument. After the State's brief was filed, the Supreme Court held in *Trevino* that, although Texas law did not expressly require IAC claims to be raised on collateral review, *Martinez* still applied because Texas law limited claims on direct review to the trial record, thus making it "virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim on direct review." 133 S. Ct. at 1918. The Washington rule, by limiting the evidence on direct appeal to the record, *see McFarland*, 899 P.2d at 1257, poses the same practical barrier to raising IAC claims as the Texas rule at issue in *Trevino*.[15] Thus, the third and fourth *Martinez* requirements are met.

As to the first two *Martinez* requirements—substantiality and ineffective assistance of PCR counsel—the state argues that the defaulted IAC claims are meritless and that Woods therefore cannot show PCR counsel provided ineffective assistance of counsel by failing to raise them in the state court. The dissent similarly argues that Woods's claims are meritless and that we should therefore reject Woods's *Martinez* arguments. However, given the nature of the IAC claims, we believe that the substantiality and ineffectiveness issues should be addressed in the first instance by the district court. As Judge Watford observed in *Detrich*, determining whether these requirements are satisfied generally "requires a highly fact- and record-intensive analysis." 740 F.3d at

---

[15] The State also argued that its position is supported by the Eighth Circuit's decision in *Dansby v. Norris*, 682 F.3d 711, 729 (8th Cir. 2012). *Dansby* has since been vacated and remanded to the Eighth Circuit for further consideration in light of *Trevino*. *See Dansby v. Hobbs*, 133 S. Ct. 2767 (2013).

1262 (Watford, J., concurring).   Here, evaluating the substantiality of the new IAC claims requires consideration of the State's DNA evidence and the reliability and propriety of the inferences the State's expert drew from it, as well as the likelihood that the DNA evidence was contaminated. Even the State acknowledges that "[t]he new claims . . . involve multifaceted allegations of a scientific nature, concerning counsel's investigations into the DNA evidence, the State's handling of the DNA evidence, and an expert's review of the DNA evidence." Moreover, Woods argues that, on remand, he should be afforded an evidentiary hearing and an opportunity to expand the record.   With an appropriate showing, he may pursue such remedies in the district court. *See Dickens*, 740 F.3d at 1321; *Detrich*, 740 F.3d at 1246–47 (four-judge plurality opinion).   Allowing the district court to consider these issues in the first instance and to potentially conduct an evidentiary hearing will greatly aid this court's review.   *Detrich*, 740 F.3d at 1262 (Watford, J., concurring). We therefore remand to the district court so that it may determine in the first instance whether Woods's DNA-IAC claims are substantial and whether PCR counsel was ineffective for failing to raise them.   *Id.* at 1254 (four-judge plurality opinion); *see also Dickens*, 740 F.3d at 1320.[16]

---

[16] We leave for the district court to resolve whether an evidentiary hearing should be held in connection with Woods's *Martinez* claims.   To the extent that the State argues that *Pinholster* and § 2254(e)(2) categorically bar Woods from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default, we reject this argument.   *See Dickens*, 740 F.3d at 1320–22; *Detrich*, 740 F.3d at 1247.

## 2.  The autoradiograms

Woods argues that his counsel's failure to ensure that the DNA autorads[17] went into the jury room amounted to a *Strickland* violation.  At trial, the autorads were used to help illustrate Dr. Brown's testimony regarding DNA.  *In re Woods*, 114 P.3d at 621.  The jurors were informed that the autorads were for demonstrative purposes only.  *Id.*  During deliberations, the jury asked to see the autorads, but the trial court denied the request on the basis that they were only used for illustrative purposes.  *Id.*  Neither the prosecution nor defense counsel objected to this ruling.  *Id.*

The Washington Supreme Court held that, "when an exhibit is used for illustrative purposes only and the jurors are instructed that the exhibit is not evidence, than [sic] the exhibit should not go to the jury room."  *Id.* at 622 (citing *State v. Lord*, 822 P.2d 177, 194 (Wash. 1991)).  Thus, the court held that the trial court correctly refused to send the autorads to the deliberation room for consideration.  *Id.* at 428.  We are bound to defer to that interpretation of Washington state law.  *See Bradshaw*, 546 U.S. at 76.  In light of that ruling, Woods cannot show prejudice resulting from his counsel's failure to object to the trial court's exclusion of the autorads from the jury deliberation room.  Even if defense counsel had objected, the objection would have been properly overruled under Washington law.  Woods is therefore not entitled to habeas relief on this claim.

---

[17] An autoradiogram is "a photographic recording of the positions on a film where radioactive decay of isotopes has occurred."  Committee on DNA Technology in Forensic Science et al., DNA Technology in Forensic Science 167 (1992).

### G.  Venus Shaver's testimony

In his federal habeas petition, Woods asserted that he received ineffective assistance of counsel when his trial counsel failed to address Venus Shaver's "recovery" of her memory of the attack and failed to cross-examine her adequately on her prior false claim that Woods raped her. The district court concluded that because Woods had failed to fairly present these claims to the state court, they were procedurally barred.  We agree that these claims were not fairly presented to the state court.

In his opening brief, Woods admits that he did not specifically address in his PRP his counsel's failure to impeach Venus Shaver effectively.  In fact, Woods's Washington Supreme Court PRP makes no mention of either Venus Shaver or her "recovered" memories.  He argues, however, that because these new arguments do not fundamentally alter his claim that trial counsel were ineffective and unprepared to impeach witnesses, he fully and fairly presented them to the state court.

Although Woods alleged the specific Sixth Amendment guarantee recognized by *Strickland*, his state court petition did not make any reference to his counsel's failure to impeach Venus Shaver.  The most analogous claim is Woods's allegation that his counsel failed to impeach Johnny Knight properly.  That claim simply did not provide a sufficient factual basis for the state supreme court to have a fair opportunity to apply controlling legal principles to the facts relating to the claim.  Thus, Woods's claim relating to Venus Shaver was not fairly presented and may be procedurally defaulted.

Woods contends, however, that he has established cause and prejudice excusing his procedural default on this issue. In particular, he contends that his failure to raise this issue before the state supreme court was a result of ineffective assistance of his post-conviction counsel. We vacate the district court's ruling and remand this claim to the district court so that it may consider in the first instance whether Woods can show cause and prejudice under *Martinez*.

## H.  Cumulative Deficiencies

Woods argued in his PRP that the cumulative impact of his counsel's deficiencies prejudiced his defense and requires reversal of his conviction. We have previously recognized that "prejudice may result from the cumulative impact of multiple deficiencies." *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978). "[A]lthough individual errors may not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights." *Davis*, 384 F.3d at 654 (citing *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995)). Although Woods's trial counsel might not have provided a model defense, counsel's "missteps and misjudgments did not render [Woods]'s trial fundamentally unfair." *Id*. We therefore affirm the denial of relief on Woods's claim of cumulative deficiency.[18]

---

[18] This holding is subject to the caveat that, should the district court ultimately conclude that Woods's procedural default of his DNA-IAC and Venus Shaver-related IAC claims was excusable and that trial counsel's assistance was ineffective with respect to these subjects, the district court may reevaluate whether the cumulative impact of counsel's deficiencies requires reversal.

## XI.  CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the district court's denial of Woods's petition.  We remand for the district court to consider in the first instance whether Woods can show cause and prejudice under *Martinez*.

**AFFIRMED in part, VACATED in part, and REMANDED.**

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

The Supreme Court gave Dwayne Woods an inch. The majority gives him a mile. When the Court remanded this case to the same panel that affirmed Woods's sentence in 2011, it gave Woods the opportunity to argue that his four procedurally defaulted claims deserved a federal audience. But none of these new claims cast any doubt on Woods's manifest guilt for the brutal murders of Jade Moore and Telisha Shaver on April 27, 1996. Fortunately, the third victim of his senseless violence, Venus Shaver, survived to testify against him at trial. And even Woods himself invited his death sentence when, at the penalty phase of the trial, he told the jury that he had "no objection" to a death sentence, and asked them to "go back and return a vote to impose the death penalty."

Because none of Woods's new claims would lead a reasonable juror to conclude that Woods did not murder Jade Moore and Telisha Shaver, or attempt to murder Venus Shaver, no court can provide Woods the relief he seeks. The majority's remand serves only one purpose: unnecessary delay. I respectfully dissent from Sections X.F.1, X.G, and footnote 18 of the majority opinion.

I

On remand from the Supreme Court, we must now consider whether Woods's four procedurally defaulted claims meet the narrow requirements of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Woods alleges that his trial counsel provided ineffective assistance by failing to: (1) call an expert witness to refute Venus Shaver's claim that she had recovered

memories of the attacks; (2) cross-examine Venus about a false rape allegation against Woods; (3) call a defense expert to interpret the results of the State's DNA evidence; and (4) explore the possibility of DNA contamination. Woods argues that the ineffectiveness of his post-conviction counsel ("PCR counsel") excuses the procedural default of these four claims, and that had the jury heard more on these topics, there is a substantial possibility he would have been acquitted.

But Woods is entitled to a remand under *Martinez* only if he can show that: (1) PCR counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for not raising a claim of ineffective-assistance-of-trial-counsel ("IAC"), and (2) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that . . . the claim has some merit." *Martinez*, 132 S. Ct. at 1318.

The Supreme Court has said that to succeed on a *Strickland* IAC claim, Woods must show not only that his trial counsel was deficient but *also* that this deficient performance caused prejudice. *Strickland*, 466 U.S. at 694. Even if Woods proves that his trial counsel was *manifestly* ineffective, Woods cannot prevail unless he shows prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Because Woods challenges only his conviction (and not his death sentence), he must demonstrate that his new claims would cause at least one reasonable juror to find him "not guilty" of the murders of Jade Moore and Telisha Shaver, or the attempted murder of Venus Shaver. This is simply not possible in the face of the incriminating evidence against him.

None of Woods's new claims can refute the strength of the inculpatory evidence conclusively demonstrating his guilt: (1) Sherry Shaver's identification of Woods as the man she saw fleeing the crime scene on the morning of the murders; (2) Jade Moore's statements to a treating paramedic, nurse, and physician, before she succumbed to her injuries, that "a man named Dwayne" hit her "with a baseball bat" and "sexually assaulted" her, and Jade's statements to her father that her attacker was "Dwayne," "a guy that Venus had been going out with"; (3) expert testimony that Woods's latent fingerprints were found on a bottle and on a telephone in the trailer; (4) the fact that Woods's coat and shirt were found at the crime scene; and (5) paging and telephone records demonstrating that Woods's pager had been called from the trailer a few hours before the murders. Nor do Woods's new claims refute the fact that, immediately after the murders, Woods was seen at two businesses near the crime scene, and was then dropped off in downtown Spokane near a number of ATMs where Jade Moore's stolen ATM card was used to make withdrawals. Finally, the new claims do not challenge Woods's statements to a friend that he was "a wanted man," or that Woods led police on a car chase as they attempted to apprehend him, permitting the jury to infer his consciousness of guilt.

The strength of the evidence against Woods was overwhelming. As a result, there is no way Woods can show that, but for counsel's errors, a reasonable juror would have found that Woods did not murder Jade Moore and Telisha Shaver or attempt to murder Venus Shaver. While it may be "standard practice" for us "to remand to the district court for a decision in the first instance without requiring any special justification for so doing," we need not do so "where there is little doubt about the correct answer." *Detrich v. Ryan*,

740 F.3d 1237, 1248 (9th Cir. 2013) (four-judge plurality opinion). The majority does not tell us what the district court should do on remand in the face of this record other than reiterate this obvious conclusion. Because Woods cannot possibly show prejudice under *Strickland*, his new claims are not "substantial," and a remand to the district court is unwarranted even under *Martinez*. *See also Lopez v. Ryan*, 678 F.3d 1131, 1139 (9th Cir. 2012) (concluding that a claim was not substantial under *Martinez* where the petitioner could not show prejudice under *Strickland*).

II

Even if I thought it necessary to review the performance of Woods's trial counsel, I would reach the same conclusion: Woods is not entitled to a remand. None of Woods's newly alleged IAC claims demonstrate that Woods's counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. Nor would any of Woods's specific claims have been reasonably likely to change the outcome of his trial. Because Woods's new claims have no merit, they are not substantial under *Martinez*.

A

Woods first alleges that Venus Shaver "had complete amnesia of the events of April 27, 1996." Dr. Demakas, a neurosurgeon who treated Venus, testified that when he was first examining Venus in the emergency room, she "did not recall what happened" and "was amnesic from the accident." At that time, Venus was still suffering from the immediate side effects of blunt head trauma and a large skull fracture. Woods argues that, by the time of trial, Venus had recovered "*considerable* memory of the events," and he contends that

his counsel was ineffective for failing to call a neuropsychologist who would have testified that such memory recovery is impossible. But Woods's new claim is much ado about nothing.

While Dr. Demakas did testify that Venus was "amnesic," he also stated that, while it would not be "uncommon" for Venus to recover memories, these memories might be out-of-order or influenced by suggestive stimuli. Thus, through Dr. Demakas's testimony, the jury heard that Venus did not immediately recall the events of that evening, and that any recovered memories could be suspect. Additional testimony on this point would have been largely cumulative.

Also, Venus's memory problems were discussed at length during the trial by Venus herself. Venus recalled in great detail bringing Woods to her house, Woods growing angry, Woods sexually assaulting her, Woods slamming her head into a door, and her repeated attempts to get Woods to leave. After that, however, her memory went blank. The "last thing [she] saw" was "[Woods] coming up to [her]." In response to counsel's question of "what happens then?" Venus said she "[didn't] remember . . . probably cuz [sic] I got hit." She repeatedly recognized that her memory of the remainder of the evening was practically non-existent. But the jury could easily fill in the rest of the story from all available evidence, including the recovery from the crime scene of an aluminum baseball bat stained by human blood and the large skull fracture in Venus's head consistent with being hit by a blunt instrument.

Although Venus could not recall the events of the rest of the evening, except for a few "flashes of memories," defense counsel expressly suggested to the jury what the source of

Venus's recovered memories really were: newspaper articles, television accounts, and family statements. Defense counsel got Venus to admit on cross-examination that: (1) she had read a lengthy news article about the case while in the hospital even though she knew she wasn't supposed to; (2) she had watched television accounts of the attack; (3) a television account featured a picture of Woods; (4) she spoke with her family at the hospital about what happened to her; and (5) Dr. Demakas told her that she would have "flashes of memories" about the attacks.

Woods alleges that his counsel should have called an expert to testify on the issue of recalled memory. But the expert's proposed testimony would have been cumulative. Given that counsel had introduced ample evidence of Venus's memory problems, counsel's failure to introduce expert testimony on this point was not deficient under *Strickland*. The jury heard all of the impeachment through competent cross-examination but obviously believed the eyewitness victim who was present when Woods committed his atrocious crimes. No remand is appropriate on this insubstantial claim. *See Sexton v. Cozner*, 679 F.3d 1150, 1157–58 (9th Cir. 2012).

## B

Woods next argues that counsel should have aggressively challenged Venus regarding a statement she allegedly made accusing Woods of rape. But Woods fails to show that his counsel's decision not to cross-examine Venus was deficient. As the victim of this savage attack, Venus was an extremely sympathetic witness. Arguably, Woods's counsel acted wisely by not pursuing this point on cross-examination to avoid further alienating the jury. This strategic decision, by

understandably wary defense counsel, is essentially insulated from *Strickland* reversal. *Id.* at 1156; *Strickland*, 466 U.S. at 689. For that reason, Woods's counsel was not deficient.

C

Next, Woods challenges his counsel's failure to call an expert to interpret the results of a DNA test implicating Woods. At trial, the State's DNA expert, Dr. John Brown, testified that the male DNA recovered from the crime scene matched Woods's DNA at four of six loci. Dr. Brown concluded that, at the other two loci, the results were inconclusive, although they did not exclude Woods as the donor. Woods argues that, if called to testify, Dr. Donald Riley would have explained that the results at five of the six loci were inconclusive, meaning that Woods's DNA conclusively matched the DNA recovered at the crime scene at only one locus. But even if Woods's counsel was deficient for failing to rigorously challenge the DNA evidence with the assistance of a qualified DNA expert, Woods would have, at best, only neutralized this evidence, a narrow sliver of the State's overwhelming case against him. Even without the DNA, a jury would still find Woods guilty as charged.

D

Finally, Woods claims that his counsel was ineffective for failing to argue that a blood spill in the crime lab might have led to Woods's blood sample being commingled with vaginal swabs taken from Jade Moore. At trial, State crime lab forensic scientist William Morig explained that Woods's blood vial spilled in an area of the lab where hair examination took place. Morig testified that once the spill was discovered, the sample was immediately destroyed. On cross-

examination, Woods's counsel re-confirmed the spill. Thus, on two separate occasions, the jury heard that a spill took place in the lab. Trial counsel was not ineffective for declining to introduce additional cumulative testimony on this point. Because the claim is not "substantial" under *Martinez*, there is no need to remand.

## III

In support of their decision to remand, my colleagues note that "[a]llowing the district court to consider these issues in the first instance and to potentially conduct an evidentiary hearing will greatly aid this court's review." Opinion at 51. They cite to *Detrich*, where we chose to remand the *Martinez* question to the district court to allow it to decide the merits first. But even *Detrich* recognized that if the evidence of guilt was "overwhelming and unassailable," then "we could safely conclude that [the petitioner] has no real chance of showing that his new trial-counsel IAC claims are 'substantial.'" *Detrich*, 740 F.3d at 1249. Such is the case here. Because Woods's guilt is manifest, we can declare on the current record that his claims are not substantial. *See Sexton*, 679 F.3d at 1158 (concluding that remand to the district court was improper under *Martinez* because Sexton's claim was not "substantial"); *Murray v. Schriro*, 746 F.3d 418, 458 (9th Cir. 2014) (concluding that Murray's ineffective-assistance-of-trial-counsel claim lacked sufficient merit to warrant a *Martinez* remand).

Moreover, *Detrich* is distinguishable. In *Detrich*, the "central question" was "whether any of Detrich's newly presented trial-counsel IAC claims prejudiced him at *sentencing*." 740 F.3d at 1249 (emphasis in original). Because Detrich's jury was split on whether Detrich was

guilty of first-degree murder or felony murder, the prejudice inquiry hinged on whether, if evidence that Detrich was the actual killer was weaker, Detrich would nonetheless have been sentenced to death. *Id.* This was a close question—"if the trial evidence were close, then it would not take too much new exculpatory evidence to call into question the trial judge's sentencing decision." *Id.* Here, Woods's habeas claims are directed only to his *conviction*, not his sentence. (Woods did not present any mitigating evidence; instead, he invited the jury to impose the death sentence.) Thus, the relevant prejudice inquiry is *not* whether Woods's new claims may have affected the sentence imposed, but whether the new claims cast doubt on Woods's guilt. They do not.

The majority also notes that "evaluating the substantiality of the new IAC claims requires consideration of the State's DNA evidence and the reliability and propriety of the inferences the State's expert drew from it, as well as the likelihood that the DNA evidence was contaminated." Opinion at 51. But the majority focuses on counsel's deficient performance and turns a blind eye to the fact that, even if Woods establishes counsel's ineffectiveness, he must still show prejudice under *Strickland*. *See Strickland*, 466 U.S. at 687; *Lopez*, 678 F.3d at 1139. Even if Woods convinces us that his trial counsel was glaringly ineffective, he cannot possibly show that any reasonable juror would have found him not guilty.

IV

In light of the overwhelming evidence against him, no court can grant Woods the relief he seeks. The majority ignores this foregone conclusion, favoring endless litigation instead. The only purpose this remand will serve is to delay

for years the seventeen-year-old judgment properly obtained against a murderer who asked the jury to impose the death sentence upon him for what he had done. I respectfully dissent from Sections X.F.1, X.G, and footnote 18 of the majority opinion. I concur in the remaining sections upholding the denial of Woods's other claims for habeas relief.